2022 IL App (1st) 210899

No. 1-21-0899

Third Division
March 9, 2022

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| *In re* S.G. and J.G., Minors | ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee, | ) ) ) ) | Nos.    20 JA 1037          20 JA 1038 |
| v. | ) ) | The Honorable |
| Stella G., Respondent-Appellant). | ) ) ) | Andrea Buford, Judge Presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

## OPINION

¶ 1    The instant appeal arises from the juvenile court's adjudication order making minors S.G. and J.G. wards of the court due to abuse by their mother, respondent Stella G. Respondent appeals, claiming that the juvenile court erred in finding that the children were abused. For the reasons that follow, we reverse.

¶ 2                                    BACKGROUND

¶ 3    Minor S.G. was born on December 30, 2015, and was five years old at the time of the adjudication hearing. Minor J.G. was born on August 19, 2017, and was nearly four years old at the time of the adjudication hearing. Respondent is the mother of both children, and their

purported father is O.G., respondent's ex-husband; an order of default was entered against him on April 5, 2021, and he is not a party to the instant appeal.

¶ 4    On July 15, 2020, the State filed two petitions for adjudication of wardship asking for each minor to be adjudicated a ward of the court; the State also filed two motions for temporary custody on the same day. In the adjudication petitions, the State claimed that each minor was neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), was abused with a substantial risk of physical injury under section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2018)), and was dependent because of a lack of proper care due to the physical or mental disability of a parent under section 2-4(1)(b) of the Juvenile Court Act (705 ILCS 405/2-4(1)(b) (West 2018)).

¶ 5    The facts underlying all claims were the same. According to the petitions, there was a history of domestic violence between respondent and her husband[1] while the minors were present, and there was one indicated report against respondent's husband as to the minors following one such incident. Following that incident, respondent was offered and refused community-based services in March 2020. The petitions further alleged that on July 10, 2020, respondent reported to law enforcement that she had attempted suicide by drinking a cleaning agent while the minors were present in the home. As a result of this incident, respondent was psychiatrically hospitalized. The petitions alleged that respondent has been diagnosed with major depressive disorder and has been prescribed psychotropic medication; according to the

_____

[1]Respondent's then-husband, G.G., is not the children's father and is not a party to these proceedings. Respondent's medical records indicate that she informed medical personnel that she had obtained an order of protection and had filed for dissolution of the marriage following the July 2020 incident, but the current status of their marriage is unclear from the record on appeal.

petitions, medical personnel opined that respondent was not safe to be with her children at the time.

¶ 6      On the same day, based on the allegations contained in the petitions for adjudication of wardship, the juvenile court found probable cause that the minors were neglected, abused, and dependent and that immediate and urgent necessity existed to support their removal from the home. The court granted temporary custody of both minors to the Department of Children and Family Services (DCFS) guardianship administrator.

¶ 7      On June 28, 2021, the parties appeared before the juvenile court for an adjudication hearing, where they proceeded by way of stipulation.[2] The parties stipulated that, if called to testify, DCFS child protection investigator Teresa De Carli would testify that, on July 12, 2020, she was assigned to investigate a "C Sequence" allegation that respondent attempted to harm herself and made suicidal statements while home with the minors and was transported to a hospital. As part of her investigation, De Carli learned that the family had prior DCFS involvement and that respondent's husband, G.G., had been indicated for substantial risk of physical injury and environment injurious to health and welfare by neglect after a domestic violence incident in the home. De Carli would testify that, on July 13, 2020, she conducted an in-person conversation with respondent at "Northwest Community Behavioral Health Hospital," where respondent informed De Carli that she had opened Tide laundry detergent pods, mixed them with water, and drank four sips of the mix in an attempt to die by suicide. Respondent then went to check on her children, and when she opened the bedroom door, she called 911 to be taken to the hospital. Respondent informed De Carli that she had received a

_____

[2]The written stipulation is not contained in the record on appeal, but the State read it into the record during the hearing.

threatening phone call earlier and that "she ha[d] not been herself lately," with a migraine that "would not stop." Respondent informed De Carli that G.G. had abused her and that she had an order of protection against him.

¶ 8    The parties also stipulated that, if called to testify, respondent would testify that prior to ingesting the Tide pods, she asked her mother to take the children to the convenience store and ingested the Tide pods while the children were away. When the children returned approximately 10 minutes later and she went to check on them, she realized her mistake and called 911.

¶ 9    Finally, the parties stipulated to the foundation for People's exhibit No. 1, which was respondent's medical records from Northwest Community Healthcare, and the trial court admitted the records into evidence. Since the State used several entries from these records in support of its argument, we discuss the relevant records briefly.

¶ 10    A record dated March 18, 2020, shows that respondent was admitted to Northwest Community Hospital's emergency department for a head injury. Respondent reported that she had been in a physical altercation with G.G., who pushed her into a wall and caused her to hit her head. Respondent reported that "this is not the first time this has happened" and expressed that she did not feel safe to return home with him. A note contained in the medical record indicated that respondent would be taken to a friend's home by the police.

¶ 11    A record dated May 1, 2020, shows that respondent had an office visit with her primary care doctor. Respondent reported that, after the March 2020 incident, she obtained an order of protection against G.G. but lifted it after a week, reporting that "because of the coronavirus situation she did not want her husband to have [nowhere] to stay." Respondent reported a total of four physical altercations with G.G., and at least one was "worse" than the March 2020

incident, but respondent declined to provide specifics. Respondent reported that G.G. had not lived at home for the past four weeks, and respondent encountered him once the prior month, when he returned to pick something up.

¶ 12    A record dated May 18, 2020, shows that respondent had a follow-up telemedicine appointment with her primary care doctor. Respondent reported that she had not encountered G.G. since the March 2020 incident, and she was "not ready to get back together."

¶ 13    A record dated June 6, 2020, shows that respondent had a telephone consultation with Northwest Community Healthcare's behavioral health unit after her primary care doctor had diagnosed her with depression and generalized anxiety disorder the prior month. Respondent reported being abused by G.G. since August 2019, with the abuse beginning as verbal abuse and escalating to physical and sexual abuse. Respondent reported that she visited the hospital in March 2020 after G.G. struck her and pushed her against the wall. Respondent filed a police report and G.G. was arrested, but respondent dropped the charges approximately five weeks ago. Respondent reported having an order of protection against G.G., which had recently expired. She further reported that G.G. had made threats against her in the past but that he no longer lived in the home and she felt safe in her household. The clinical notes in the report recommended that respondent receive regular therapy.

¶ 14    A record dated July 11, 2020, shows that respondent was admitted to the emergency department at the hospital after ingesting four to five Tide pods. Respondent denied any current suicidal ideation and stated that she became "upset" after a discussion and "got depressed." Respondent had no prior history of suicide attempts or other self-injurious behavior. Respondent had previously been referred to outpatient therapy at the beginning of June but had not followed up because she did not have time and had issues with childcare. Respondent's

friend Ivan,[3] who cared for the children while respondent was in the hospital, reported to medical personnel that respondent had recently become unemployed. The medical record also provides that respondent and G.G. were "currently separated," but respondent reported that G.G. "has been coming and going from the house." It was recommended that respondent receive inpatient acute care, and she received a diagnosis of "Major Depressive Disorder, Single Episode Severe."[4] The "[d]isposition" section of the medical record includes the following:

> "Psychiatrist consulted: Dr Mohiuddin
>
> Level of Care Recommendation: Inpatient Acute Care
>
> Inpatient criteria: 24 hr behavior monitoring, Suicidal/homicidal risk
>
> Precautions Type: Suicide, Close Observation
>
> Clear and Present Danger to Self or Others: Yes
>
> Refused Treatment: Yes (describe) (Pt wants to go home and care for kids who are with friend.)
>
> Name of treatment facility: Psych at NCH"

¶ 15   Respondent's medical records show that she was admitted to the Northwest Community Hospital's behavioral health unit for inpatient psychiatric care on July 12, 2020, and was discharged on July 18, 2020. The "Reason for Hospitalization" was listed as "Danger to self and/or others." However, a psychiatric evaluation completed on July 12, the first day of her inpatient hospitalization, provided that a suicide risk assessment indicated that "Overall level

---

[3]Ivan's last name is not contained in the record on appeal.

[4]We note that respondent's discharge from the emergency department shows "Final Diagnoses" of "Major depressive disorder, recurrent severe without psychotic features (HCC)" and "Anxiety disorder, unspecified." The reason for the discrepancy is unclear.

of suicide risk is Low." A psychological assessment completed on July 13 provided that respondent had reported her relationship status as "Separated for about 6 weeks."

¶ 16    Finally, respondent's medical records contain records from several visits following her psychiatric admission, which we find relevant to the issues on appeal. Respondent first met with a licensed clinical social worker on July 23, 2020. Respondent reported that she had been separated from G.G. "for the last 3 months" and that she felt safe now that she was away from him, although she reported that he called her several times to threaten to report her to immigration authorities. Respondent further reported being compliant with her medication and expressed a desire to engage in therapy with the social worker. The next day, respondent had a psychiatric follow-up visit after her hospitalization. Respondent reported that she had filed for an order of protection against G.G. and that he was her " 'biggest stressor' and since she is not near him she is feeling safe and able to better cope with her emotions." A risk assessment indicated that respondent demonstrated no suicidal ideation.

¶ 17    Respondent also had several appointments on July 30, 2020. She reported to her primary care doctor that she had filed for an order of protection against G.G. and was filing a petition for dissolution of marriage. She further reported that she "[f]eels optimistic going forward and wants to move on from her marriage." Respondent similarly reported to the social worker that she had an order of protection against G.G. and had filed a petition for dissolution of marriage. Respondent reported that G.G. had not attempted to contact her since the issuance of the order of protection. Finally, during a psychiatric exam, respondent reported that she was currently filing for dissolution of her marriage and " 'I just want to move on with my life.' " During a follow-up psychiatric exam on September 3, 2020, respondent reported:

"She has [an] order of protection against her spouse which she had identified as the primary antecedent for her inpatient hospitalization. She has since changed her phone number and has not been in contact with spouse, continues to file for divorce. Reports she has been able to deal with this stressor well and it is not causing her any decompensation of symptoms."

¶ 18    After all parties rested and after hearing the arguments of the parties, the court found that the State had met its burden of proving neglect due to an injurious environment and abuse due to a substantial risk of physical injury, finding:

"The family has a history of involvement with the Department. Mom attempted self-harm with children present. Mom has been involved in a domestically violent relationship with her husband and felt unsafe with him. She was also found to be a risk to herself and others. For those reasons, the State has met its burden."

Accordingly, the juvenile court entered an adjudication order finding both minors neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act and abused due to a substantial risk of physical injury under section 2-3(2)(ii) of the Juvenile Court Act because "there is a history of [domestic violence]. Mother attempted suicide and required hospitalization. She was a risk to self and others." However, we note that the court did not indicate in its written order whether the abuse or neglect of the minors was the result of abuse or neglect inflicted by a parent, guardian, or legal custodian of the minors.

¶ 19    On the same day, the juvenile court entered a dispositional order finding it in the minors' best interest to make them wards of the court but finding respondent fit, able, and willing to

care for, protect, train, and discipline the minors.[5] Accordingly, the court ordered the minors returned to the care and custody of respondent. This timely appeal follows.

¶ 20                                                    ANALYSIS

¶ 21          On appeal, respondent challenges only the juvenile court's finding that the minors had been abused; she does not challenge the finding that they were neglected and does not challenge the court's dispositional order. "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). It is the State's burden to prove allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. "In other words, the State must establish that the allegations of neglect [or abuse] are more probably true than not." *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 22          Generally, a reviewing court will reverse the juvenile court's determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006); see also *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶ 56; *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009); *In re Gabriel E.*, 372 Ill. App. 3d 817, 828 (2007). "Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision." *In re April C.*, 326 Ill. App. 3d 245, 257 (2001) (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998)).

---

[5]The court also found O.G., the minors' father, unable for some reason other than financial circumstances alone to care for, protect, train, or discipline them.

¶ 23   However, in the case at bar, the parties proceeded by way of stipulated facts and documentary evidence; no witnesses testified at the adjudication hearing. Accordingly, respondent, the State, and the public guardian all agree that the appropriate standard of review is *de novo*. Since the juvenile court was in no better position than the reviewing court to assess credibility or weigh the evidence, we agree and review the juvenile court's finding *de novo*. See *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28 (where the juvenile court's neglect finding was based on a stipulated record, review was *de novo*); *In re M.D.*, 2021 IL App (1st) 210595, ¶ 26 (same). *De novo* consideration means we perform the same analysis that a trial judge would perform. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 51.

¶ 24   As an initial matter, the public guardian claims that respondent's appeal is moot because she has not challenged the juvenile court's finding of neglect. It is true that courts have commonly found that the same allegations can support a finding of both neglect based on an injurious environment and abuse based on a substantial risk of physical injury. See, *e.g.*, *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44 (finding that the same facts that supported a finding of neglect also supported a finding of abuse); *In re R.G.*, 2012 IL App (1st) 120193, ¶ 46 (same). It is also true that, where a party is appealing both the court's finding of abuse or neglect and its dispositional order, reviewing courts often move to the consideration of the dispositional order after finding evidence to support one of the bases without considering the others. See, *e.g.*, *In re Faith B.*, 216 Ill. 2d 1, 15 (2005) (finding neglect on one basis and finding no need to review the additional bases before proceeding to consideration of dispositional order). However, the public guardian does not cite any authority for the proposition that a failure to challenge *all* bases for an adjudication of wardship means that a parent is not entitled to challenge *any* of the bases. Indeed, we have regularly considered cases

in which only one of several bases is being appealed. See, *e.g.*, *In re A.S.*, 2020 IL App (1st) 200560, ¶ 22 (respondent was challenging only the finding of abuse, not the finding of neglect). In the case at bar, while the finding of neglect and the finding of abuse may be supported by the same evidence, they are still separate bases for the court's adjudication of wardship, and we find that respondent is entitled to present her arguments challenging the finding of abuse even if she does not challenge the finding of neglect. See *In re M.W.*, 386 Ill. App. 3d 186, 198 (2008) (affirming juvenile court's finding that minor was subjected to an environment that was injurious to his welfare but nevertheless did not constitute a substantial risk of physical injury). Accordingly, we proceed to consider the merits of respondent's arguments on appeal.

¶ 25        Under section 2-3 of the Juvenile Court Act, an abused minor includes one whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018). In the case at bar, the juvenile court found that both minors were abused and listed two bases for its finding: the history of domestic violence between respondent and G.G. and respondent's suicide attempt. We consider each basis in turn.

¶ 26        First, the trial court found that the minors were abused because "there is a history of [domestic violence]." It is undisputed that G.G. was the perpetrator of the domestic violence at issue, not respondent.[6] However, we note that the focus of an adjudicatory hearing is not whether respondent abused the minor but, rather, on whether the minor was abused. *In re R.G.*,

---

[6]As noted, the juvenile court's adjudication order does not specifically identify the perpetrator of the abuse. However, as to the domestic violence, there is no evidence in the record that respondent was anything other than a victim of G.G.'s abuse, and no party suggests otherwise.

2012 IL App (1st) 120193, ¶ 35. Thus, if the juvenile court properly found that the minors were abused, the fact that G.G., and not respondent, was the perpetrator of the domestic violence that resulted in a substantial risk of physical injury to the minors is largely irrelevant. See *In re R.G.*, 2012 IL App (1st) 120193, ¶ 35 ("who committed the alleged abuse of [the minor] is of no particular consequence in an adjudicatory hearing").

¶ 27    However, the fact that G.G. was the perpetrator of the domestic violence is relevant to the question of whether the minors were abused at the time of the filing of the petitions for adjudication of wardship. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 805-06 (2006) (noting that the applicable question was whether the minor was neglected or abused at the time the minor was taken into protective custody). In the case at bar, the record shows that respondent separated from G.G. prior to the July 2020 incident that precipitated the filing of the petitions. While respondent provided varying time periods throughout the medical records, it appears that the March 2020 incident of domestic violence represented the final straw in their relationship. After that date, all of respondent's records indicate that she had terminated her relationship with him. To be clear, there are indications that G.G. attempted to contact her, or that he stopped by the home to pick up items, suggesting that there may still have been some residual contact between the two, and it appears that G.G. may have been residing at the home briefly in late March, after respondent dropped her order of protection out of concern that he would have nowhere to live due to the coronavirus pandemic. However, beginning as soon as May 1, respondent was consistently reporting that G.G. no longer lived in the home. At the time of her psychiatric admission in July, respondent reported that they had been separated for approximately six weeks. Thus, at the time of the filing of the petitions for adjudication for wardship, the perpetrator of the domestic violence was no longer present in the minors' home.

¶ 28    Moreover, respondent consistently maintained this position even after the filing of the petitions. The medical records admitted into evidence as part of the adjudication hearing contained entries dating several months after the date of the petitions. We note that evidence of conduct occurring after the date of a petition for adjudication of wardship is not always admissible; admissibility depends on whether it is relevant to the allegations in the petition. *In re Kenneth D.*, 364 Ill. App. 3d at 805. Here, however, these records were part of the State's case in chief and were admitted without objection, and they are relevant in that they provide further corroboration that respondent was no longer residing with G.G. at the time of the petitions. Indeed, respondent reported the end of her relationship to medical personnel no fewer than six times between July and September 2020. For instance, respondent's records show that on July 23, respondent reported to her therapist that she had been separated from G.G. "for the last 3 months." The next day, she reported that she had obtained an order of protection against him. On July 30, during three different medical appointments, respondent reported that she had obtained an order of protection or was filing a petition for dissolution of marriage. Respondent also twice reported that she wanted to " 'move on.' " Finally, on September 3, respondent again reported that she had an order of protection, had filed a petition for dissolution of marriage, and had no contact with G.G. These records reinforce respondent's pre-petition statements that she and G.G. had ended their relationship. Consequently, the evidence contained in the record on appeal shows that, at the time of the filing of the petitions for adjudication for wardship, the source of the risk to the minors had been removed from their home.

¶ 29    None of the parties cite any cases dealing with this precise situation—where the person whose conduct gives rise to the alleged substantial risk of physical injury is no longer residing in the household at the time of the filing of the petition for adjudication of wardship. Indeed,

the State brushes aside G.G.'s absence by claiming that "[t]he fact that respondent-mother's husband was not present at the time the petitions were filed is not relevant." By contrast, the public guardian acknowledges that G.G. is no longer living in the home but argues that a finding of abuse was nevertheless proper because respondent's actions "did not erase the previous risk the children had already been exposed to, due to domestic violence in the home." However, *In re Kenneth D.*, the case the public guardian cites in support of this proposition, concerns a respondent's actions *after* the children had been taken into protective custody, not actions taken *before* the filing of the adjudication petition, as in the case at bar. See *In re Kenneth D.*, 364 Ill. App. 3d at 803. While we agree with the public guardian that nothing can erase the previous risk the children were exposed to, that is not the issue before us, nor was it the question before the juvenile court. A petition for adjudication of wardship alleges that "the minor *is* abused" as defined by the Juvenile Court Act (emphasis added) (705 ILCS 405/2-13(2) (West 2018)), not "was abused" or "has been abused in the past." In other words, the juvenile court is asked to determine whether a minor is abused at the time of the filing of the petition, not at some prior time. To be clear, a history of abuse is surely relevant and may support a finding that the minor is currently abused, especially when such conduct is ongoing. However, the public guardian cites no authority suggesting that, where the source of the risk has been removed from the household, as in the case at bar, a minor may nonetheless be found to be abused based on a past risk.

¶ 30    While not entirely analogous, we find instructive the reasoning courts have employed in discussing a similar issue in the context of anticipatory neglect. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they

14

reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d at 468. In such cases, courts have found that the fact that the perpetrator of the prior abuse or neglect is no longer living in the home with the minor means that a finding of neglect or abuse based on the prior conduct may be inappropriate.

¶ 31      For instance, in *In re Zion M.*, we affirmed the juvenile court's finding that the minor was not abused or neglected, even though her siblings had been found to have been abused and neglected shortly before her birth. *In re Zion M.*, 2015 IL App (1st) 151119, ¶¶ 32-34. We found that, because the perpetrator of the abuse and neglect was no longer living in the home, the State's anticipatory neglect argument "must fail." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34. Similarly, in *In re M.W.*, we affirmed the juvenile court's finding that the minor was not abused due to a substantial risk of physical injury, even though the respondent had surrendered her parental rights to his sibling when she was four months pregnant with the minor due to abuse and neglect. *In re M.W.*, 386 Ill. App. 3d at 197-98. We found that the perpetrator of the sibling's abuse and neglect was incarcerated and no longer involved with the respondent, and we determined that the juvenile court properly determined that the respondent's conduct did not rise to the level of a substantial risk of physical injury. *In re M.W.*, 386 Ill. App. 3d at 198. Courts have also made clear that a finding of anticipatory neglect must ultimately turn on the minor's current situation and that past abuse or neglect of a sibling did not automatically mean that the minor was also abused or neglected. See *In re Arthur H.*, 212 Ill. 2d at 468-69; *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995). Indeed, "even under anticipatory neglect, neglect or abuse to a sibling becomes incredibly less important than what is occurring with, and to, the

specific minor in question, who is to be the central focus." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35.

¶ 32      In the case at bar, the evidence before the juvenile court at the adjudication hearing established that respondent was the subject of domestic violence at the hands of G.G. and that the most recent instance of domestic violence occurred in March 2020 when respondent was taken to the emergency room of the hospital after G.G. had pushed her into a wall. However, the evidence further establishes that, after that date, G.G. was no longer part of the household. As explained above, after the March incident, respondent consistently reported that G.G. was no longer living in the home and that she was engaging in measures to sever their relationship, including obtaining an order of protection and beginning the process of dissolving their marriage. While the record shows that there may have still been incidental contact after that time, there is no evidence that G.G. has resided with respondent or her children since, at the latest, March or April 2020. Thus, at the time of the filing of the petitions for adjudication of wardship in July 2020, G.G. had been removed from the minors' household. Consequently, where respondent's abuser was no longer present, we cannot find that the minors were abused due to a substantial risk of physical injury based on the history of domestic violence.

¶ 33      We next consider the juvenile court's finding that the minors were abused due to a substantial risk of physical injury because their "[m]other attempted suicide and required hospitalization. She was a risk to self and others." We note that the juvenile court did not make any specific finding that respondent suffered from a mental illness. However, because both the State and the public guardian in their briefs analyze respondent's suicide attempt as an example of a mental illness or mental health issue, we briefly set forth the law concerning the issue of mental health in the context of adjudication proceedings. In the context of neglect, our supreme

16

court has emphasized that "it is not enough for the State to show simply that the parent suffers from a mental illness. Rather, the State must also show that the mental illness 'places the children in an injurious environment.' " *In re Faith B.*, 216 Ill. 2d at 14 (quoting *In re Faith B.*, 349 Ill. App. 3d 930, 933 (2004)). We find that the same applies with respect to a finding of abuse; that is, the State must show that the parent's mental illness "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018). To find otherwise would be imposing a *per se* rule regarding mental illness, which our supreme court has made clear is inappropriate. See *In re Faith B.*, 216 Ill. 2d at 14.

¶ 34        In the case at bar, the sole "mental health issue" identified by the State as forming the basis for the adjudication petitions was respondent's suicide attempt in July 2020. It is important to note that the State did not allege, and the evidence did not show, that respondent had a history of such attempts, nor did she have a history of untreated mental health issues. Respondent's medical records show that, after the March 2020 domestic violence incident, respondent reported in May to her primary care doctor that she was feeling depressed and stressed due to the domestic violence situation, which manifested itself in difficulty sleeping; respondent denied suicidal or homicidal ideation. Respondent's doctor prescribed her clonazepam and referred her to the behavioral health unit, advising her that therapy would assist her. Respondent's diagnoses at that visit were "Insomnia," "Adjustment disorder with depressed mood,"[7] and "Victim of spousal or partner abuse." At a follow-up appointment, respondent

---

[7]The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), provides that the presence of emotional or behavioral symptoms in response to an identifiable stressor is the "essential feature" of adjustment disorders and, by definition, the symptoms in adjustment disorders begin within three months of the onset of a stressor and last no longer than six months after the stressor or its

reported that the medicine was helping and that she had not received any calls from the behavioral health unit; her doctor advised her to follow up with the behavioral health unit. At another follow-up appointment, respondent reported that she "really wishes to have behavioral health, [and] therapy," and was provided a direct number to the behavioral health unit. Respondent had a telehealth appointment with the behavioral health unit on June 6, 2020, where a behavioral health assessment revealed no current or recent suicidal or homicidal ideation, no history of self-injurious behaviors, and no history of harming others. Respondent was recommended to seek regular therapy on an outpatient basis. However, respondent's records from the emergency department visit in July 2020 indicate that respondent reported that she had not followed up on the recommendation for therapy due to lack of time and issues with childcare. Respondent's behavior prior to her suicide attempt does not demonstrate the type of untreated mental health issues that courts have found to support a finding of abuse or neglect. See, *e.g.*, *In re Faith B.*, 216 Ill. 2d at 14-15 (noting that the respondent's issues included physically attacking one of her children, "increasingly bizarre and unpredictable" behavior, and refusing to take her psychiatric medication).

¶ 35     Indeed, our prior decision in *In re A.S.*, 2020 IL App (1st) 200560, demonstrates the type of conduct that we have determined supports an abuse finding. In that case, the respondent had several mental health issues, for which she was not taking her medicine as prescribed, causing her symptoms such as auditory hallucinations and hearing voices. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 31. The respondent instead self-medicated with alcohol, resulting in numerous occasions where she displayed aggressive and otherwise dangerous behavior, including several

---

consequences have ceased. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 *Adjustment Disorders* 287 (2013).

acts of violence directed at her mother. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 31. The minor was present in the home during at least one of these instances, where he needed to physically intervene to break up an altercation between the respondent and her mother. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 31. We found that the respondent's untreated mental health issues, coupled with the instances of violence, supported a finding of abuse. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 31. The evidence with respect to the case at bar, by contrast, reveals no such issues.

¶ 36    The question we must consider, then, is whether the single incident alleged in the adjudication petitions—respondent's suicide attempt—is sufficient to support a finding that the minors were abused due to a substantial risk of physical injury. We note that, in the context of neglect, our supreme court has reversed a finding of neglect based on two displays of anger by the respondent, where the State "failed to show anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury." *In re N.B.*, 191 Ill. 2d 338, 353 (2000). While each case is *sui generis* and must be decided on its own facts (*In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 31), in the case at bar, we similarly find that the State failed to show that the single incident alleged in its adjudication petition rose to the level of subjecting the minors to a substantial risk of physical injury. Respondent's actions were certainly not ones that should be repeated, but the record shows that respondent immediately realized her mistake, calling 911 within minutes of ingesting the cleaning solution, meaning that any risk the minors faced was minimal.

¶ 37    The State and the public guardian argue that the minors were subjected to a substantial risk of physical abuse because, if respondent had succeeded in her attempt, two small children

would have been left in the home alone. However, we must look at the facts in their totality, which include the fact that respondent immediately called 911. See *In re A.W.*, 231 Ill. 2d 241, 261 (2008) (considering the totality of the evidence in reviewing a neglect finding). The Juvenile Court Act provides that a minor is abused when his parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018). In the case at bar, we cannot find that respondent's actions rise to such a standard. Accordingly, we must reverse the juvenile court's abuse finding.

¶ 38                                          CONCLUSION

¶ 39       For the reasons set forth above, we reverse the juvenile court's finding that the minors had been abused due to a substantial risk of physical injury. First, respondent's abuser, G.G., was no longer living in the household at the time of the adjudication petitions, meaning that the history of domestic violence no longer supported an ongoing risk. Additionally, respondent's suicide attempt was an isolated incident, and respondent immediately called 911, minimizing any risk to the minors.

¶ 40       Reversed.

**No. 1-21-0899**

| | |
|---|---|
| **Cite as:** | *In re S.G.*, 2022 IL App (1st) 210899 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-JA-1037, 20-JA-1038; the Hon. Andrea Buford, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*. |