2023 IL App (1st) 220817

SIXTH DIVISION
Filing Date May 5, 2023

No. 1-22-0817

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* V.S., a Minor, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 21 JA 01107 |
| v. | ) | |
| | ) | The Honorable |
| D.H.E., | ) | Jennifer Payne, |
| | ) | Judge, Presiding. |
| Respondent-Appellant.) | ) | |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent-father D.H.E appeals from an adjudication finding of neglect as to V.S., minor, and a dispositional order that adjudicated V.S. a ward of the court.[1] On appeal, respondent contends that (1) the adjudicatory finding of neglect was improper and deprived him of due process where the petition made no allegations against respondent and thus denied him the

_____

[1]V.S.'s mother is not a party to this appeal.

opportunity to defend against the petition, (2) the adjudicatory finding of neglect was against the manifest weight of the evidence and (3) the disposition order should be reversed where the circuit court failed to provide a factual basis for its disposition. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        The record reveals that on November 29, 2021, the State filed a petition for adjudication of wardship regarding V.S., a minor. V.S. was born on November 22, 2021. The petition included the names and addresses of the minor's parents, S.S. (mother) and D.H.E. (respondent). The petition alleged that V.S. was taken into custody on November 23, 2021, at 10 a.m. with a temporary custody hearing scheduled for November 29, 2021. The petition further alleged that V.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)) because he was a minor under 18 years of age whose environment was injurious to his welfare. As factual support, the State alleged that the mother had two prior indicated reports for inadequate supervision and substantial risk of physical injury/environment injurious to his health/welfare by neglect. Mother had two other minors who were in Department of Children and Family Services (DCFS) temporary custody with findings entered, mother was noncompliant with offered and recommended reunification services, mother had untreated mental health issues, mother was psychiatrically hospitalized after the birth of V.S., and paternity had not been established.

¶ 4        Additionally, the petition alleged that V.S. was abused in that his parent or immediate family member created a substantial risk of physical injury to the minor by other than accidental means, which would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function under section 2-3(2)(ii) of the

Act (*id.* § 2-3(2)(ii)). As factual support for this allegation, the petition restated the prior factual allegations. The petition sought a declaration that V.S. be adjudged a ward of the court.

¶ 5 Also on November 29, 2021, the State filed a motion for temporary custody of V.S. The pleadings included an affidavit of Daneen Sydnor, dated November 24, 2021, that documented DCFS efforts and averred that she was the caseworker assigned to V.S.'s case and that the case came to DCFS's attention due to the substantial risk of physical injury/environment injurious to the child's health and safety by neglect. She further averred that mother had DCFS history, including having two of her children in DCFS custody; mother had not completed any services to reunify her children and had not seen the children since they were removed from her care; and mother had a history of untreated mental health and had delusions and manic outbreaks.

¶ 6                                    A. Temporary Custody Hearing

¶ 7 A shelter care hearing was held on November 29, 2021, and respondent was present. Mother was not present. The circuit court appointed an attorney for respondent, and the public guardian's office was appointed as guardian *ad litem* (GAL) for V.S.

¶ 8 Sydnor testified that mother was in the psychiatric unit at Jackson Park Hospital and V.S. was placed with his maternal grandmother, who cleared a DCFS background check and requested placement. Sydnor explained that respondent was not listed on V.S.'s birth certificate so he was not considered for placement.

¶ 9 Respondent testified that on November 22, 2021, he was present at the hospital for V.S.'s birth and on November 23, 2021, he signed the minor's birth certificate and a voluntary acknowledgement of paternity (VAP) for the minor. Respondent stated that "right after" he signed the VAP, mother had a "mood swing" and requested that he be removed as the named father. Respondent also stated that he refused to allow mother to use his address and she

"snapped." Respondent thought he was added back to the birth certificate but did not have copies of any documents he signed at the hospital and did not know the name of the hospital social worker who provided the documents. Respondent acknowledged paternity. Respondent testified to an on-again, off-again relationship with mother and that she was staying with him when she learned of her pregnancy. However, they "bumped heads" and subsequently separated.

¶ 10    After the shelter care hearing and over respondent's objections, the circuit court awarded temporary custody of V.S. to DCFS, finding that probable cause existed that the minor was neglected and abused based on the allegations in the petitions of an injurious environment. The court also ordered a DNA test to determine if respondent was V.S.'s father.

¶ 11                                    B. Status Hearings

¶ 12    Status hearings were held between November 2021 and February 2022. On November 30, 2021, Sydnor testified that she ran a criminal background check on respondent and learned that he had more than 20 charges, with "four or six" convictions for defacing a firearm, possessing a firearm owner's identification card that was not his, and robbery. Respondent served five years in prison and completed probation in 2016. Respondent did not have any pending criminal cases, and Sydnor did not believe that respondent's prior convictions were a bar to V.S. being placed with him. On February 4, 2022, the parentage test established that respondent was V.S.'s father, and the court entered a parentage order for respondent.

¶ 13                                    C. Adjudication Hearing

¶ 14    The adjudication hearing was held on May 4, 2022.

¶ 15    At the adjudication hearing, Sydnor testified that she was assigned to investigate mother on November 24, 2021, after receiving information that mother had other children in DCFS

custody and was having a psychiatric episode after giving birth to V.S. Sydnor went to the hospital where she spoke with mother and respondent, who indicated that he was V.S.'s father, that he wanted custody, and that he lived in a family building with relatives that would assist him with V.S. Sydnor did not perceive respondent to be a risk to V.S. at that time.

¶ 16        Michael McKay testified for the State that he was a supervisor at ChildLink, the agency assigned to mother's other two children, neither of whom were respondent's children. When V.S. was born, mother was not participating in services and had not visited the children.

¶ 17        The State's exhibits included mother's medical records. In late November, when V.S. was born, hospital staff determined that mother had acute psychiatric problems and was a threat to others, including V.S., and that she needed involuntary psychiatric hospitalization. Mother's active medical issues included acute postpartum psychosis and schizoaffective disorder, bipolar type.

¶ 18        The records also indicated that a doctor also spoke with respondent, who indicated that mother had been more "energetic, excited, and enthusiastic" in the prior week, which he attributed to mother's excitement about the baby. Respondent stated that he was mother's partner for the prior year and that she often said God chose her and would speak to her, which made him uncomfortable because mother "puts [*sic*] the voice first." Respondent also indicated that he was concerned that mother could not care for V.S. due to her housing instability, religious beliefs, and history with DCFS.

¶ 19        Mother testified that she did not have mental health issues and stated that she was a "chosen child." Mother described issues with her relatives who cared for her other two children as the reason she did not visit them.

¶ 20        The circuit court noted that when V.S. was born, mother and respondent signed a VAP, but mother was acutely psychotic at the time and rescinded the VAP. It was unclear whether the VAP was valid due to her mental health, which is why a DNA test was ordered at the temporary custody hearing. The court told respondent that, under those circumstances, it would not have been appropriate for DCFS to place V.S. with him.

¶ 21        The court found V.S. was neglected due to an injurious environment under section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) and further found V.S. dependent due to mother's mental disability under section 2-4(1)(b) of the Act (*id.*§ 2-4(1)(b)). Respondent's attorney requested that the order reflect that respondent was noncustodial when V.S. was born or that mother was the sole person causing V.S.'s neglect. The State objected, and after an off-the-record discussion, the court noted that mother's medical records showed that respondent significantly downplayed mother's mental health needs and the court needed to know that respondent would not leave V.S. in the care of someone that would harm him. The court then stated that the dependency finding was to mother only but that the neglect finding would stand as to both. The adjudication order noted that mother had to be separated from the minor by hospital staff after the minor's birth due to concern about mother's mental health and behavior and that respondent downplayed mother's mental health concerns. The dispositional hearing was then scheduled for May 18, 2022.

¶ 22                                D. Dispositional Hearing

¶ 23        The dispositional hearing was held on May 18, 2022, with respondent present. The State, the GAL, respondent, respondent's counsel, and mother were all present in court via Zoom.

¶ 24        The GAL admitted two exhibits into evidence without objection by the parties: a March 23, 2022, integrated assessment and a March 7, 2022, DCFS service plan. The integrated

assessment was conducted by a licensed clinician to gather information about the family and evaluate their service needs. The assessment noted that V.S. was diagnosed with a ventricular septal defect in his heart in January 2022 and would be assessed for surgery when he was four months old.

¶ 25 Respondent was interviewed in January 2022, and the clinical assessment reported that in "SACWIS"[2] there were numerous intakes that contained concerns that respondent was in a sexual relationship with a minor and one intake reporting that he admitted to doing so. An August 2020 SACWIS intake also reported that respondent was having the minor recruit other girls. Both respondent and the minor denied the sexual relationship in December 2019. Respondent told the clinical evaluator that he knew the minor and saw her every day, but she was a friend and he was teaching her how to drive. Respondent also stated that his ex-girlfriend was jealous of him spending time with the minor and falsely alleged that he was having sex with the minor. A DCFS note from July 2020 indicated that respondent had three children with his ex-girlfriend, who resided with their grandmother in the same building where he lived, but respondent did not see them often. Respondent told the evaluator that he co-parented with his ex-girlfriend and saw the children three to four times a week. Further, respondent stated that the ex-girlfriend was violent towards him and had previously hit him with a car.

¶ 26 According to an October 2021 criminal background check, respondent had been arrested and charged 44 times with five convictions for dangerous drugs, larceny, robbery, and two convictions for weapons offenses (the assessment does not list the dates of the convictions). Respondent had also been arrested 7 times for assault, 6 times for dangerous drugs, 5 times for

---

[2]SACWIS is the Statewide Automated Child Welfare Information System operated by DCFS.

larceny, 2 times for invasion of privacy, and 19 times for traffic offenses. When respondent was questioned by the evaluator about his criminal background, respondent stated that he was convicted of a weapons offense after a gun was found in the back seat of a car he was riding in and he successfully completed a bootcamp and probation. The evaluator also noted that a March 4, 2020, SACWIS intake reported that respondent may have had access to guns and gang involvement.

¶ 27    Respondent and mother met in December 2020 and had a brief relationship. However, after mother informed respondent that she was pregnant, she moved in with him. Respondent reported that the pregnancy was planned and that he thought that having a child with mother would give her more of a focus so she could be in a better state of mind and that he could help her. Respondent reported that he soon realized that mother could not care for a child and that mother would be aggressive towards him. In November 2021, respondent reported that he had a live-in girlfriend and told the evaluator in January 2022 that he was in a relationship with someone, but that person would not see V.S. Respondent indicated that he wanted custody of V.S. once his parentage was established.

¶ 28    The clinical evaluator's overall assessment of respondent noted that his criminal record and the reports of the sexual relationship with the minor, if true, "would pose a risk to any child in his care without appropriate and possible intensive interventions." The evaluator questioned respondent's judgment with regard to his perception of mother, his self-perceived ability to help her focus by having a baby together, and his history of choosing unsafe partners, as he had been the target of emotional and physical abuse in past relationships. Respondent was interested in parenting V.S., had visited V.S. in his foster home, and lived in a building with relatives who he believed would help him with V.S.

¶ 29        The evaluator recommended that respondent receive individual therapy and a Nurturing Parenting Program (NPP), a competency-based parenting education and coaching service for parents whose children had experienced trauma and adversity. Respondent was also recommended for domestic violence service due to his reports of being a domestic violence victim. Lastly, respondent needed to complete a drug evaluation due to his history of "extensive" drug use.

¶ 30        Letitia Sanders, the assigned case manager from ChildLink, testified that V.S. was five months old, was placed with his maternal grandmother, and that it was an appropriate placement. V.S. had recently had heart surgery to repair a hole in his heart and was recovering in the hospital at the time of the hearing. V.S.'s grandmother and respondent were supposed to receive training on how to care for V.S. prior to his discharge. Mother was not engaged in services or visiting V.S.

¶ 31        Sanders testified that respondent needed individual therapy, a NPP, and drug testing. Sanders had submitted those referrals, but the service providers had not yet contacted respondent. Respondent tested negative for drugs in May 2022. Sanders planned to refer respondent for a domestic violence assessment after he began or completed his other services. Additionally, respondent was having supervised visits with V.S., and there were no problems reported with those visits.

¶ 32        Sanders indicated that respondent's interactions with V.S. went well, and she found his parenting skills were appropriate. Respondent appeared to have a very loving bond with V.S., and his family members would assist him in caring for V.S., as they lived in the same building. Sanders recommended that V.S. be returned to respondent but had not discussed her recommendations with her supervisor.

¶ 33       On cross-examination by the GAL, Sanders first testified that V.S. should not be made a ward of the court and that respondent was fit, willing, and able to care for V.S. Sanders believed that respondent was capable of taking care of V.S. with the support of his family. The GAL told Sanders that the issue for a dispositional hearing was whether the parents were fit, willing, and able, and V.S. would be returned to whichever parent was capable of caring for him. The GAL also told Sanders that if the parents still needed services, then V.S. would be made a ward of the court, and the parents would receive reunification services. At that point, Sanders testified that she believed V.S. should be made a ward of the court.

¶ 34       Sanders testified that she reviewed the DCFS integrated assessment and believed that respondent should engage in therapy and the parenting program prior to receiving domestic violence services so that he was not overwhelmed by too many services.

¶ 35       On cross-examination by respondent, Sanders testified that respondent was willing to engage in services and that she would follow up to make sure that the referred providers of individual therapy and parenting classes would contact respondent. She also indicated that she had not yet visited respondent's home but planned to. Respondent reported to Sanders that he had a crib and other items in his home for V.S.

¶ 36       The GAL informed the court that she was concerned that the caseworker was unprepared and unfamiliar with the integrated assessment. In response, the circuit court stated that it thought it was clear from Sanders's testimony that she felt respondent was referred for services and that respondent needed supportive services. The court noted that respondent was only getting supervised visits at that time and had not progressed to unsupervised or overnight visits. The court also indicated that there was no reason to delay the domestic violence assessment

while respondent was engaged in other services. However, the court indicated that it did not believe that any of these things would change the outcome of the dispositional hearing.

¶ 37    Respondent testified on his own behalf that he wanted custody of V.S. and was willing to participate in services but was concerned that V.S.'s maternal grandmother and foster parent did not have to take parenting classes so he questioned why he needed to. Respondent believed that "deep down," he did not feel as though there was any problem with him. However, respondent was willing to do whatever he had to do and complained that he could have done all of his services by that point, but the caseworker was slow. Respondent was willing to ensure that V.S. did not have contact with anyone who was not allowed to have contact with him.

¶ 38    At the conclusion of the disposition hearing, the circuit court adjudged V.S. a ward of the court as being in his best interest and welfare, finding that both parents were unable to care for the minor at that time. The court noted that reasonable efforts were made but were unsuccessful at that time and ordered V.S. placed in DCFS's guardianship. After indicating that both parents had the right the appeal, the court addressed respondent directly:

> "[Respondent] we are going to have a very quick permanency hearing. Just bear with us. You are obviously—the evidence presented today is that you have a great bond and relationship with your child. I want you to know that I heard that and I am well aware of that. There are services that you were just referred to that have not yet begun. And I just want to make sure that those services are in place and the case continues to go in a positive direction. But I don't want you to be discouraged by your child being a ward. He is going to remain in his current placement. That's not going to change. He is going to be with maternal grandmother."

¶ 39     The circuit court then entered a written dispositional order finding both parents unable and placing V.S. in DCFS's guardianship. The matter then proceeded to a permanency hearing. The court's order indicated a goal of return home within 12 months and gave the agency discretion to allow respondent unsupervised visits after his home was checked for safety and he began services. The court found that respondent had made some progress towards return home. The case was set for a permanency planning hearing on October 28, 2022.

¶ 40     Respondent filed his timely notice of appeal on June 9, 2022.

¶ 41                              II. ANALYSIS

¶ 42     On appeal, respondent contends that (1) the adjudicatory finding of neglect was improper and deprived him of due process where the petition made no allegations against respondent and thus denied him the opportunity to defend against the petition, (2) the adjudicatory finding of neglect was against the manifest weight of the evidence, and (3) the disposition order should be reversed where the circuit court failed to provide a factual basis for its disposition.

¶ 43                              A. Timeliness

¶ 44     Before discussing the arguments respondent raises in his appeal, we address the timeliness of our decision. This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to Rule 311(a)(5), we are required to issue our decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Petitioner's notice of appeal was filed on June 9, 2022, making the deadline to issue our decision November 7, 2022. However, petitioner filed three motions for extension of time before ultimately filing his appellant brief on November 18, 2022. Thereafter, the state's attorney requested an extension to file its brief and the public guardian filed two motions for extension to file its brief. Accordingly, we revised the briefing schedule pursuant to those

requests.[3] The public guardian's brief was ultimately filed on January 27, 2023, and the state's attorney's brief was ultimately filed on February 2, 2023. The case was not ready for disposition until February 9, 2023, and respondent's reply brief was filed on February 22, 2023. We therefore find good cause for issuing our decision after the 150-day deadline. We now turn our attention to the merits of petitioner's issues on appeal.

¶ 45                    B. The Adjudicatory Finding of Neglect (Respondent's Issues I and II)

¶ 46      Respondent makes two arguments related to the adjudicatory finding of neglect. First, respondent contends that the neglect finding was improper and deprived him of due process where the petition for adjudication of wardship made no allegations against respondent, thus denying him an opportunity to meaningfully defend against the finding of neglect. Second, respondent contends that the adjudication order finding him neglectful should be reversed because the circuit court's finding of neglect was against the manifest weight of the evidence.

¶ 47      However, both the State and the GAL respond that respondent's contentions are moot because he does not also challenge the dependency finding and only one ground of neglect, abuse, or dependency is needed to affirm a circuit court's adjudication order. In his reply brief, respondent responds to the mootness argument that both the State and the public guardian are estopped from arguing that it is irrelevant whether respondent was named as a perpetrator. Additionally, respondent maintains that the circuit court's "no-fault" dependency finding does not make his challenge to the neglect finding moot.

¶ 48      A proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly. *In re S.G.*, 2022 IL App (1st)

---

[3]No objections were filed to any of the requests for extension.

210899, ¶ 21 (citing *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). It is the State's burden to prove allegations of neglect or abuse by a preponderance of the evidence. *Id.* The State must establish that the allegations are more probably true than not. *Id.* Cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *In re A.P.*, 2012 IL 113875, ¶ 17. This analytical principle underscores the fact-driven nature of neglect and injurious environment rulings. *Id.*

¶ 49     Generally, a reviewing court will reverse the juvenile court's determination only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *In re S.G.*, 2022 IL App (1st) 210899, ¶ 22. Because a circuit court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision. *Id.*

¶ 50     Section 2-21(2) of the Act provides that if the court determines that the minor is either abused or neglected or dependent, then a dispositional hearing shall be held to determine whether it is in the best interest of the minor to be adjudged a ward of the court. 705 ILCS 405/2-21(2) (West 2020). As such, the court needs to make only one of those findings to proceed to a dispositional hearing. The question before us is whether respondent's challenge solely to the circuit court's neglect finding but not the dependency finding renders his appeal moot.

¶ 51     Courts of review will generally not decide abstract, hypothetical, or moot questions. *McHenry Township Road District v. Pritzker*, 2021 IL App (2d) 200636, ¶ 34. An appeal is considered moot where there is no actual controversy or a reviewing court cannot grant the complaining party effectual relief. *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 23.

¶ 52    The question of whether a respondent's appeal of only one ground of an adjudicatory finding and not another issue included in the adjudication order is moot has been decided on three recent occasions, with opposite results.

¶ 53    First, in *In re S.G.*, 2022 IL App (1st) 210899, ¶¶ 21, 24, respondent challenged only the circuit court's abuse finding but did not challenge the neglect finding or the dispositional order and the public guardian argued that the appeal was moot. In determining that the appeal was not moot, a panel of this court rejected the proposition that a failure to challenge all bases for an adjudication of wardship means that a parent is not entitled to challenge any of the bases. *Id.* ¶ 24. The court additionally noted that we have regularly considered cases in which only one of several bases is challenged. *Id.*

¶ 54    The issue was next considered in *In re G.U.*, 2022 IL App (1st) 220759, which was decided by a different panel of this court after *S.G.* In *G.U.*, the circuit court found all three named minors to be neglected and additionally found one of the minors to be abused. *Id.* ¶ 2. On appeal, the mother only challenged the finding of abuse, not the findings of neglect. *Id.* ¶ 19. The appellate court first found that the issue of whether evidence established that the minors were neglected was waived, and because of the waiver, the court subsequently determined that the mother's challenge to the abuse finding was moot. The appellate court stated that the finding of neglect alone was sufficient for the case to proceed to a dispositional hearing. *Id.* ¶¶ 19-20. The court specifically noted that it was unclear what the practical effect would be even if it were to conclude that the abuse finding was against the manifest weight of the evidence. *Id.* ¶ 20.

¶ 55    Finally, in *In re J.R.*, 2022 IL App (1st) 221109, ¶ 38, a third panel of this court considered whether the mother's challenge to only the abuse finding and not the finding of neglect or the

dispositional order rendered her appeal moot. The court declined to follow *S.G.* because the *S.G.* court did not address the mootness doctrine's rationale, *i.e.*, to limit the court's review to actual controversies in cases where the relief requested would have a practical effect. *Id.* ¶ 43. The court chose instead to follow the rationale and holding of *G.U.* because, even if it found that the abuse finding was erroneous, the dispositional order would not be vacated and the finding of the mother's inability to care for the minor would remain intact. *Id.* ¶¶ 44-45.

¶ 56     Turning to the case at bar, we agree with the decisions of *G.U.* and *J.R.* and find that the portions of respondent's appeal related to whether the circuit court's adjudicatory determination that V.S. was neglected is moot because respondent did not challenge the court's finding of dependency. Even if we were to conclude that there was error in the finding of neglect, the dependency finding would still be intact, and thus the matter would still be subject to the dispositional process. As such, any determination solely on the issue of the neglect finding is moot as it would have no practical outcome.

¶ 57     However, we do take this opportunity to address respondent's primary issue with the adjudication findings, namely that he was not named as the perpetrator of the neglect or the cause of the minor's dependency, which should preclude such findings against him. Respondent's arguments are without merit.

¶ 58     In any proceeding initiated pursuant to the Act, including an adjudication of wardship, the paramount consideration is the best interests of the child. *In re A.P.*, 2012 IL 113875, ¶ 18. The Act proscribes the procedures that must be followed for determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *Id.*

¶ 59     Relevant to respondent's first and second issues, the first step is the adjudicatory hearing on the petition for adjudication of wardship. *Id.* ¶ 19. At the adjudicatory hearing, the court

shall first consider only the question of whether the minor is abused, neglected, or dependent. *Id.*; 705 ILCS 405/2-18(1) (West 2020). The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected. *In re A.P.*, 2012 IL 113875, ¶ 19. Indeed, our supreme court has concluded that the consideration of the relative blame of each parent for the child's neglect at the adjudicatory stage is improper. *Id.* ¶ 20. The cause of the neglect is not relevant at the adjudicatory stage. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 29; *In re Arthur H.*, 212 Ill. 2d at 467. The Act specifically instructs the court to consider only whether the minor is neglected and not whether the parents are neglectful. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 29.

¶ 60    Here, the factual evidence presented at the adjudicatory hearing, through both documentary evidence and testimony, clearly established that V.S. was found neglected based on mother's behavior at the hospital and anticipatory neglect. Specifically, mother was separated from V.S. after suffering a psychiatric episode following his birth and V.S.'s two siblings were also placed in DCFS temporary custody in 2019 due to mother's mental health issues. Additionally, the record supports the court's finding, which respondent supported in the circuit court, that V.S. was dependent based on the mother's mental health issues. It is irrelevant as to which parent was neglectful, the proper inquiry is whether the minor was neglected (or dependent), and we find that the evidence presented at the adjudicatory hearing supports the circuit court's conclusions of dependency and that they were not against the manifest weight of the evidence.

¶ 61                                C. Dispositional Hearing

¶ 62    Respondent also contends that the dispositional order should be reversed where the caseworker's uncontroverted testimony overwhelmingly established that respondent was fit, willing, and able to parent V.S., yet the circuit court adjudicated V.S. a ward of the court and

granted guardianship to DCFS without providing a factual basis for its decision. As noted above, the circuit court found respondent unable to care for V.S. at the time of the dispositional hearing and awarded guardianship to DCFS.

¶ 63    If the circuit court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2020). The court must hold a dispositional hearing within six months of the minor's removal from the home. *Id.* § 2-22(4). At the dispositional hearing, the circuit court may commit the minor to wardship and place guardianship and custody with DCFS if the court determines that (1) the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so and (2) the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents. *Id.* § 2-27(1). The paramount consideration is the best interests of the child. *In re B.S.*, 2022 IL App (2d) 220271, ¶ 31. Section 2-27's purpose is not to terminate parental rights but, rather, to decide what future actions are in the best interests of the child and whether to make the child a ward of the court. *Id.*

¶ 64    As noted above, a reviewing court defers to the trial court's findings of fact because it is in the best position to observe the testimony of the witnesses, assess their credibility, and weigh the relative evidence. *Id.* ¶ 32. We will reverse the trial court's determination only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *Id.* Under the manifest weight standard, an

appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 65 In the case at bar, the evidence presented by the State and the GAL indicated that respondent needed services such as individual therapy, parenting classes, and domestic violence services due to his report of being a domestic violence victim. None of those services had been completed nor were they in process at the time of the hearing. Additionally, the caseworker had not visited or assessed whether respondent's home was an appropriate environment for V.S., who was at the time of the hearing, hospitalized and recovering from recent heart surgery. The circuit court further noted that respondent only had supervised visits and was not yet receiving unsupervised or overnight visits. The record contradicts respondent's characterization of the caseworker's testimony; while it is clear that she supported respondent's eventual reunification with V.S., she agreed that at the time of the hearing, respondent was not able to care for V.S. without completing the necessary services. Moreover, before officially entering its findings, the circuit court addressed respondent directly that the evidence presented showed that respondent had a great bond and relationship with V.S., there were services referred that had not yet begun, and that the court wanted to make sure that the services were in place and that the case continued to go in a positive direction. We conclude that the evidence supports the circuit court's finding that respondent was unable to care for V.S. at the time of the dispositional hearing and order granting guardianship and custody to DCFS. The circuit court's determination was not against the manifest weight of the evidence.

¶ 66                                    III. CONCLUSION

¶ 67 In conclusion, we find that respondent's issues on appeal related to the circuit court's adjudication of neglect were moot where he failed to also challenge the dependency finding.

We affirm the circuit court's dispositional finding that respondent was unable to take care of V.S. and order granting guardianship and custody to DCFS. The adjudication and disposition orders of the circuit court of Cook County are affirmed.

¶ 68        Affirmed.

***In re V.S.*, 2023 IL App (1st) 220817**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-01107; the Hon. Jennifer Payne, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Ross K. Holbert, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Victoria L. Kenney, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Miriam T. Smith, and Christopher Williams, of counsel), guardian *ad litem*. |