NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241125-U

NO. 4-24-1125

IN THE APPELLATE COURT

FILED
January 13, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re M.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 24JA119 |
| v. | ) | |
| Tammy D., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Vancil and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court's decision to adjudicate the minor neglected was not against the manifest weight of the evidence.

¶ 2                  I. BACKGROUND

¶ 3            A. The Neglect Petition and Shelter Care Order

¶ 4        In March 2024, the State filed a four-count petition seeking to adjudicate seven-year-old M.D. (born June 2016) a neglected minor under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)). The State alleged in the petition filed against respondent, Tammy D., and James D. (father), who is not a party to this appeal, that M.D.'s environment was injurious to her welfare due to respondent (1) having a substance abuse problem which prevented her from properly parenting M.D. (count I), (2) engaging in acts of domestic violence in the presence of M.D. (count II), and (3) leaving M.D. with a someone who

was a stranger to M.D. to run errands but not returning for several days and only after being contacted by law enforcement (count IV). See *id*. 2-3(1)(b)). In count III, the State alleged M.D. was neglected because she was:

> "not receiving the proper or necessary support, education, as required by law, or medical or other remedial care recognized under State law as necessary for the minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or *** abandoned by his or her parents *** in thatr [*sic*] there is no running water in the home, the stove does not work, the refrigerator does not work, the tub is full of dirty water, there is not food in the home, and fixtures from the lights have been smashed and broken glass left on the ground."

See *id*. § 2-3(1)(a).

¶ 5　　　　The statement of facts filed with the petition explained, *inter alia*, M.D. had been living with her aunt, Tawna Pete, for the past year and had recently returned to living with respondent. M.D. had missed "a lot of school" since moving back in with respondent. M.D. was dropped off at Angela Mercer's home by respondent's friend, Kayse Lamping-Freeman, because respondent and her paramour were fighting. M.D. had no extra clothing, coat, or provisions with her, and was supposed to stay at Mercer's home for one night along with Lamping-Freeman. However, Lamping-Freeman asked Mercer to watch M.D. for approximately 45 minutes, but she then left and never returned. Mercer attempted to contact Lamping-Freeman and respondent for several days without success, so she called the police because no one had contacted her about M.D.'s whereabouts or well-being the entire time. Respondent has a history of drug use and

domestic violence witnessed by M.D.

¶ 6        Both parents appeared via Zoom at the shelter care hearing on April 4, 2024, and waived their rights to a hearing. The trial court entered an order granting temporary guardianship and custody of M.D. to the Illinois Department of Children and Family Services (DCFS). M.D. was placed in the care of Tawna and Randy Pete.

¶ 7                        B. The Adjudication of Neglect

¶ 8        The adjudicatory hearing, scheduled for June 26, 2024, was rescheduled because neither parent appeared. Respondent's counsel stated she was reportedly ill that day. The adjudicatory hearing was subsequently held on July 8, 2024. Despite confirming with her counsel the evening before the rescheduled hearing that she planned to appear, respondent failed to do so. The trial court proceeded with the hearing.

¶ 9        The trial court granted the State's motion to admit the indicated packet into evidence. Thereafter, the State called Donna Norman, a child protection specialist for DCFS, to testify. She testified that on March 3, 2024, DCFS received a report that M.D. was left home alone and there was alleged drug use in the home. The first time Norman went to the home as part of her investigation, she was unable to make contact with anyone. On her second visit, Norman "made contact with an individual who denied that she was [respondent] and was informed that [respondent] had moved from the residence in question." She later determined this was inaccurate; respondent and M.D. were still residing at the home. Norman stated she had "very limited contact" with respondent during her investigation because her numerous attempts to contact respondent went unanswered. She testified she was unable to do a physical walk-through of the home to complete a safety check. Norman received information from family members who had been in the home, but no one from DCFS was ever able to gain access to the

home. Norman stated she spoke with M.D. about the conditions of the home. M.D. reported "there was no running water, the cabinets were gone, she was sleeping on a thin mint-colored thing on the floor, and that there was damage to the home from the walls and the doors being punched or hit, that the home was dirty." Norman also said she "believe there was [a] bathtub full of dirty water and dishes."

¶ 10 The initial report was that M.D. was being left home without any adult supervision. Norman testified that M.D. gave "conflicting reports" and "[i]t was apparent she was initially trying to protect her mom, everything was fine, and then after she was left in the care of a stranger for several days and I met with her again, then she was more forthcoming about what was happening in the home." The stranger M.D. was left with was Mercer, who was described as a "friend of a friend" of respondent. Mercer made the initial report to DCFS that respondent had left M.D. with her for three days. She made efforts to locate respondent but had to call the police when she was unable to do so. Law enforcement eventually found respondent, who was not looking for M.D. or "making any provisions" for her.

¶ 11 At this time, respondent's attorney objected to Norman testifying as to Mercer's out-of-court statements. The trial court overruled, finding the witness was "discussing basically her investigation, not necessarily for the truth of the matter." Mercer explained a friend had brought M.D.to her home and asked her to watch M.D. for a few hours because M.D. had been with her for "several days and they had been unable to reach [respondent] or anyone to retrieve her." Mercer said M.D. "wasn't well kept, [and she] needed a shower or bath" and M.D. told her that respondent "smok[ed] things just to make herself feel better."

¶ 12 Norman stated another reason for the initial call was that there was "high traffic and drug use in the home." When she spoke with respondent, Norman asked her to take a drug

test. Respondent initially said she would comply, but she never did. As part of her investigation, Norman spoke with respondent's family members, reviewed criminal and prior DCFS records, and learned respondent had a history of drug use. Respondent admitted she was a recovering addict but denied that she was currently using. Her family reported that they believed respondent was using drugs again and she was currently "hanging out" with a man named Shawn Cooper. M.D. described acts of physical domestic violence in the home between respondent and Cooper and that both used drugs in the home. At the conclusion of Norman's investigation, the allegations in the investigation were indicated.

¶ 13          On cross-examination by respondent's attorney, Norman acknowledged she never gained access to the home to confirm M.D.'s description of the home, but she stated family members who did have access corroborated its condition. Norman clarified that during her second visit to the residence, the woman who answered the door and said respondent no longer lived there was, in fact, respondent. Respondent admitted this to Norman in a subsequent phone call. Respondent agreed to meet with Norman at the residence the following week, but when Norman arrived, respondent was not there. Thereafter, Norman went to M.D.'s school to speak with her.

¶ 14          On cross-examination by the guardian *ad litem* (GAL), Norman stated she did not remember the details of the domestic violence between respondent and Cooper that M.D. reported to her. Norman stated that Christy Pete (grandmother), M.D.'s grandmother and respondent's mother, and Randy were the relatives who gained access to the residence to collect some of M.D.'s belongings after M.D. was placed in their care. They reported the cabinets and major appliances were missing and there was no water in the home. They stated the home was dirty and "in a state of disarray" and M.D.'s items "were so dirty that they left the majority of

them." Norman explained that M.D. had previously lived with Tawna and Randy and they had purchased clothing and toys for her which she took back when she returned to respondent's care. She stated, "When [M.D.] was placed back with Tawna and Randy, they had hoped to retrieve those items, but a lot of them were either missing or were in such disrepair that they did not bring them back."

¶ 15 Norman testified that when she asked M.D. about the person she was left with, she told Norman that she did not know who she was, but she was not "overly scared." When Norman was asked how she discerned M.D.'s reference to respondent smoking was a reference to drugs rather than cigarettes, she stated she spoke with M.D. about that. M.D. told Norman "she was able to differentiate that there was cigarette smoking but there was also drug smoking and that she had seen it in the front room of her home, in her bedroom, that people brought drugs to the house, that there was a difference in [respondent's] behavior when she smoked drugs."

¶ 16 Counsel for respondent and the father moved for a directed finding, which was denied. Neither respondent nor the father presented any evidence.

¶ 17 The GAL called Gabrielle Sallis, a caseworker for Youth Services Bureau (YSB), to testify. Sallis was present during M.D.'s interview in May 2024. Sallis testified that M.D. referred to the drugs her mom used as " 'white stuff' " and "just didn't know the name offhand, which it [*sic*] was cocaine." M.D. stated that respondent, Cooper, and "many people coming over" would all be in her room at times and using drugs. M.D. told Sallis that she did not want respondent to be with Cooper because he was "a danger" to her and he was the reason respondent used drugs and "doesn't care." M.D. told her "he is no good for her and I want my mom to be safe." M.D. explained that she had a mattress on the floor in her room. M.D. also told Sallis she was left in the care of a lady she did not know for a few days.

¶ 18 Counsel for respondent and the father moved for a directed finding again, which was denied. After closing arguments, the trial court took the matter under advisement and set the matter for decision on August 8, 2024. Neither parent appeared in court that day and the State indicated there was no communication from either parent (counsel for both did appear but made no comment regarding their clients' whereabouts). The court found respondent and the father waived their right to be present. The court issued its adjudicatory ruling, finding M.D. to be a neglected minor on all four counts raised in the petition.

¶ 19 C. The Disposition

¶ 20 Immediately after the adjudication, the trial court stated its intent to proceed to the dispositional hearing. The father's attorney asked for the matter to be set for a later date and objected to holding the dispositional hearing without his client, whom he believed to be "quasi homeless," living in Florida, and with outstanding warrants. Respondent's attorney did not voice an objection. The court denied the request to continue the matter, noting "the prospect of the parents appearing by postponement are poor, given their track record."

¶ 21 The State asked the trial court to take judicial notice of the following documents filed with the court on August 5, 2024: the family service plan, the integrated assessment, and a YSB report. The court also took judicial notice of the adjudicatory hearing and noted that both parents currently had outstanding warrants (respondent in Winnebago County case No. 24-CF-1925). No further evidence was presented. Counsel for respondent argued, "I don't think that the State's met their burden, at this time, Judge, for disposition. That's all I have." The GAL argued, "the warrants alone are sufficient" that neither parent was "able to provide care to the minor in addition to the Integrated Assessment, the service plan, and the court report."

¶ 22　　　The trial court found as follows:

　　　"It's clear that there are services necessary before these

parents can—clearly, they're unfit, unable, or unwilling to properly

protect, train, discipline, and educate this child. I do take notice in

addition to the fact that they have not appeared today or have not

attempted to appear, or clear up their warrants so they can appear.

　　　So as I normally say, unwilling or unable, willingness is

usually not an issue; but in this case it might because I haven't

seen very much effort into rehabilitation or interest. So I find the

State has met their burden by a preponderance."

¶ 23　　　The court entered the dispositional order granting guardianship and custody of
M.D. to DCFS. The court admonished the parents, *in absentia*, of their rights to appeal.

¶ 24　　　This appeal followed.

¶ 25　　　　　　　　　　　II. ANALYSIS

¶ 26　　　The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth the
procedures and criteria for determining whether to remove a minor from his or her parent's
custody and be made a ward of the court. *In re Arthur H.,* 212 Ill. 2d 441, 462 (2004). This
requires a two-step process. First, the trial court holds an adjudicatory hearing to determine
whether a minor is abused or neglected. *In re Z.L.,* 2021 IL 126931, ¶ 59. If the court finds the
minor abused or neglected, the court holds a dispositional hearing to determine "whether it is
consistent with the health, safety, and best interests of the minor and the public that the minor be
made a ward of the court." *Id.* ¶ 60.

¶ 27　　　Cases involving adjudication of neglect are "*sui generis*, and must be decided on

the basis of their unique circumstances." *Arthur H.,* 212 Ill. 2d at 463. The State must prove its case by a preponderance of the evidence, which requires the State to establish that "the allegations of neglect are more probably true than not." *Id*. at 464. A reviewing court will not disturb a trial court's finding of neglect or abuse unless it is against the manifest weight of the evidence. *Z.L.,* 2021 IL 126931, ¶ 61. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id*.

¶ 28        On appeal, respondent argues the dispositional order must be reversed because "the predicate adjudication of neglect was based upon inadmissible evidence." Specifically, she argues that the trial court erred in (1) taking judicial notice of neglect cases involving respondent's older children and stating respondent was found "unfit, unwilling, or unable to do [*sic*] her substance abuse and never cured that condition" and "that finding carries forward as evidence that [respondent] has a substance abuse issue that was not contradicted during our hearing"; (2) allowing Norman to testify about what Mercer told her that M.D. said about the conditions of the home, respondent's conduct, and respondent's drug use, acknowledging it as "double hearsay" but finding the statements independently admissible under Illinois Rule of Evidence 805 (eff. Jan. 1, 2011) (hearsay within hearsay); and (3) focusing on *respondent's conduct* in leaving M.D. as being neglectful rather than whether M.D. was neglected.

¶ 29        At the adjudicatory hearing, the trial court must consider only the question of whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2022). The plain language of this statutory provision requires the trial court to focus on whether the child has been neglected. *In re V.S.,* 2023 IL App (1st) 220817, ¶ 59. Furthermore, our supreme court has concluded that focusing on the cause of the neglect or the "relative blame of each parent for the child's neglect at the adjudicatory state is improper.". *Id.* (citing *A.P.*, 2012 IL 113875, ¶ 22).

Neglect is generally defined as "the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re A.P.,* 2012 IL 113875, ¶ 22. The Illinois Supreme Court has "long held" that "neglect encompasses wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of the surrounding circumstances changes." (Internal quotation marks omitted.) *Id.*

¶ 30　　　　　　After our careful review, we find the record supports the trial court's finding that M.D. was neglected under section 2-3(1)(a) of the Juvenile Court Act because she was "not receiving the proper or necessary support, education, as required by law, or medical or other remedial care recognized under State law as necessary for [her] well-being, or other care necessary for [her] well-being, including adequate food, clothing and shelter, or *** [was] abandoned by [respondent]." 705 ILCS 405/2-3(1)(a) (West 2022). Although no one from DCFS was able to gain access to complete a safety check of the home, the numerous interviews conducted during the investigation revealed ample evidence to support the court's decision. All of the information in the indicated report, which was referenced by Norman during her testimony (her testimony being challenged in this appeal), was properly admitted into evidence. See 705 ILCS 405/2-18(4)(b) (West 2022) ("Any indicated report filed pursuant to the Abused and Neglected Child Reporting Act [(325 ILCS 5/1 *et seq.* (West 2022))] shall be admissible in evidence" at an adjudicatory hearing.). When admitting an indicated report into evidence, "lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 750 ILCS 405/2-18(4)(a) (West 2022). "This language necessarily indicates the document will contain additional levels of hearsay." (Internal quotation marks omitted.) *In re D.D.,* 2022 IL App (4th) 220257, ¶ 42. Therefore, respondent's

contention regarding the court's consideration of double hearsay has no merit under the circumstances.

¶ 31 The indicated report reveals, through interviews of M.D., Mercer, and the grandmother, the circumstances of respondent abandoning M.D. when she left M.D. with a stranger for several days with no way of contacting her. M.D. stated she was "left at another person's house for 3 days and they couldn't find her mom." Police reports support that M.D. was left with someone and the police had to become involved to locate respondent. The grandmother stated that she received a call from the police due to M.D. being left with someone who was unable to find respondent for days. Mercer was interviewed and explained that respondent's friend, Lamping-Freeman, brought M.D. to her home because respondent and "her paramour" were fighting. Mercer said she had only met M.D. once before and believed Lamping-Freeman and M.D. were going to stay with her overnight. Lamping-Freeman then asked Mercer if she would watch M.D. for approximately 45 minutes, but Lamping-Freeman failed to return. Mercer made efforts to contact Lamping-Freeman and respondent for the next three days without success, so she called the police because she did not know what else to do. Several hours passed before respondent picked up M.D.

¶ 32 The indicated report further reveals the conditions of the home were insufficient to support M.D.'s well-being. The report states family members who had been in the home describe it as "filthy." During an interview with Norman which took place at M.D.'s school, M.D. admitted respondent "is not doing well and that she does not feel safe in the home." M.D. stated there "is no water in the house, the stove does not work, and the fridge does not work." She said the "tub is full of dirty water," "the house is dirty and there are no cabinets or anything because her mom and [Cooper] are taking everything out to sell it." M.D. stated that she must

shower at her grandmother's house, there is no food in her house, and her mom will call her grandmother to bring food to them. The grandmother's interview corroborated M.D.'s statements. The grandmother explained respondent's home "has no running water, no operating stove or fridge and the house is dirty." She stated there is no food in the house, she has taken food to them, and M.D. must come to her house to shower.

¶ 33            Further evidence that the conditions of the home were inadequate was revealed in the report by M.D.'s description of the persistent drug use in the home. M.D. stated that respondent "smokes drugs with a glass pipe in the home," including in M.D.'s room, and "allows other people to come to the house to smoke drugs." M.D. stated that she had seen drugs brought into her home. The report states respondent and Cooper "have an extensive substance abuse history, particularly of abusing crack cocaine." M.D. said that everyone who lives in her house takes drugs, using "pipes, glass pipes and plastic tubes to do the drugs." M.D. stated that she spends "a lot of time" with Lamping-Freeman and that Lamping-Freeman also uses drugs. M.D. stated that she "does not like the drug use in the home and that it makes her sad and frustrated because she does not want [respondent] to do drugs."

¶ 34            Based on the foregoing, we hold the evidence was sufficient to prove by a preponderance of the evidence that M.D. was a neglected minor under count III of the petition. As such, the trial court's decision was not against the manifest weight of the evidence. Having affirmed the court's adjudicatory decision finding M.D. neglected as to one of the four grounds alleged in the petition, we need not address any purported error regarding the remaining grounds. See *In re Faith B.*, 216 Ill. 2d 1, 14 (2005) (noting that when the trial court has found a minor neglected on more than one ground, a court of review may affirm if there is sufficient evidence in the record to support any one of the bases of neglect). Because of our ruling, respondent's

contention that the dispositional order must be reversed due to any error in admission of evidence on the other grounds during the adjudicatory hearing is moot. Respondent having raised no other claims regarding the dispositional order in this case, we affirm.

¶ 35                                  III. CONCLUSION

¶ 36        For the reasons stated, we affirm the trial court's judgment.

¶ 37        Affirmed.