2026 IL App (1st) 251674

SECOND DIVISION
June 23, 2026

No. 1-25-1674

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *IN RE ESTATE OF E.A., a Minor* | ) | |
| | ) | Appeal from |
| (P.A. and M.A., | ) | the Circuit Court |
| | ) | of Cook County |
| Petitioners and Cross-respondents-Appellants, | ) | |
| | ) | 24P5971 |
| v. | ) | |
| | ) | Honorable |
| L.A. and C.L., | ) | Daniel R. Degnan, |
| | ) | Judge Presiding |
| Respondents and Cross-petitioners-Appellees). | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**O R D E R**

¶ 1 *Held*: The circuit court's decision to deny grandparents' petition for guardianship of a minor and grant uncle's cross-petition was not against the manifest weight of the evidence.

¶ 2 M.A. (Grandmother)[1] and P.A. (Grandfather) appeal from an order denying their petition requesting plenary guardianship of their orphaned grandson, E.A., who had been in their care for 19 months, and granting the cross-petition of their son-in-law, C.L. (Uncle). The uncle petitioned for guardianship with his spouse, L.A. (Aunt), but after a lengthy hearing, the court granted sole

---

[1] In order to preserve the minor child's privacy, we are referring to most of the witnesses by their initials or relationship to the child.

guardianship to the uncle. In its ruling, the court found that the family has become divided, perhaps irreparably, and that Uncle was the only one of the four petitioners capable of fulfilling his duty to cultivate relationships between the child and his many family members. In addition, the grandparents did not place boundaries on the 11 year old's behavior and had blurred the distinction between grandparenting and childrearing to such an extent that the child's life was stressful. On appeal the grandparents contend that the manifest weight of the evidence supported their petition, the court was concerned about the relationship between the adults instead of the child's best interest, and that their boundaries were reasonable. The aunt and uncle respond that the court made a sound and fact-based decision and that the grandparents are mischaracterizing the record. They also respond that the grandparents have mistaken the court's restraint and diplomatic characterization of the frayed family dynamics as a misapplication of the best interest standard.

¶ 3       E.A.'s mother, K.K. (Mother), died from cancer in September 2017, just before he turned six and, four years later, his father, T.A. (Father), took his own life. Before Mother's death, the family of three was residing in Albuquerque, New Mexico. Mother's daughter from a prior relationship, C.R. (Sister), was away at college. Mother's grandparents, parents, and two brothers were living in Florida. Father's family lived in and around Evanston, Illinois, and included many extended family members; his parents (the petitioners); his only sibling and her husband (the cross-petitioners), and their two children, C.M.L. and E.L., who are slightly younger than E.A.

¶ 4       Father and E.A. were visiting the grandparents in 2020 when their trip was extended by the COVID-19 pandemic. For months, Father and E.A. shared a spare bedroom and the whole family, including Aunt's family, would have dinner together every night. Father decided to permanently relocate to Evanston, and although his home search was slowed by the pandemic, he bought a

house on Avers Avenue. His girlfriend, B.C. (Friend), also moved in. His death was about two years later, on January 19, 2024. E.A. asked to return to his grandparents for the night and the next day, when his aunt and uncle suggested that they become his guardians, his grandparents would not agree. They mediated a schedule in which E.A. split each week between his grandparents; his aunt and uncle; and his father's former girlfriend, who continued to live in the house on Avers Avenue. The two petitions seeking guardianship were filed in August and September of 2024. The former girlfriend supported the grandparents' petition. The family relationship deteriorated to the extent that agreed orders were necessary for the aunt and uncle to have visitation. The evidentiary hearing on the cross-petitions occurred over six days in July of 2025. The court heard from the four parties, E.A.'s sister, three extended family members, the former girlfriend and E.A.'s guardian *ad litem* (GAL), for a total of ten witnesses.

¶ 5     Grandfather testified that at 79, he has been living with his wife in Evanston for 53 years and retired since 2015. They spent a lot of time in Albuquerque after their daughter-in-law's death because their son was "in bad shape" and wanted help caring for E.A. E.A. started first grade with them in Evanston in the fall of 2021 and was a fourth grader when his father died. E.A. struggled with "a lot of depression there for a while" and sought out the school's psychologist, social worker, or nurse almost daily. He had also been seeing a grief therapist since before Father's death. Over the summer, he stayed mostly with his aunt and uncle because they lived closer to the nature center where he went to various summer camps. The grandparents do not think that E.A. wants to live with his aunt and uncle. They explained to him that he might have to, though, after the hearing. According to Grandfather, E.A.'s aunt and uncle could not provide a stable home for E.A., because "he's a difficult kid to deal with" and needs a lot of attention, unlike the aunt and uncle's kids. The

grandparents respect that E.A. is introspective and they "don't push anything on him." When the grandparents filed for guardianship in August and told E.A. that he no longer had to stay with his aunt and uncle, E.A. was pleased. Fifth grade started "rough," but then his grades improved and his need for the school counselors dropped off dramatically. He is really looking forward to starting middle school with his two best friends since the second grade and another good friend whom he met in the fifth grade.

¶ 6    Grandfather also testified about E.A.'s quiet routine in the grandparents' household. For instance, when E.A. wakes up, he keeps checking his iPad until it is time to get out of bed at 6:00 a.m. Then the two of them sit in silence while Grandfather reads e-mails and E.A. looks at his iPad. At 7:00 a.m., E.A. eats breakfast and gets ready for school. He has a hot lunch at school; they go to the same four restaurants for dinner every Monday through Thursday; and he has homecooked meals with Friend.

¶ 7    In addition, E.A sets his own rules and is "very regimented." E.A.'s rules include wearing clean clothes and clean pajamas every day; not eating the same thing for lunch twice in a row except during camp; not having the same thing for lunch and dinner; having dessert at 7:30; taking a bath on certain days and a shower on others at 8:00; and that everyone goes to bed promptly at 9:00. They do not limit his iPad usage, but he is very good at self-correcting. For instance, he used to be on the iPad when they went out to dinner, but then he reduced his continuous use of it on his own. His only chores are to pick up after himself, take his dishes to the sink, and clean his room. Grandfather gives in to E.A. because E.A.'s needs come first.

¶ 8    Grandfather considers E.A. to be "a pretty easy kid to deal with." He is kind, very mature, and a "people pleaser" who likes to help others. E.A. does not take criticism well, but he needs it

infrequently. Grandfather is trying to teach E.A. more self-assurance.

¶ 9    E.A. is triggered by alcohol use, but he was affected only by Father's drinking and Grandfather did not consider his glass of wine with dinner to be "drinking." Nonetheless, they quit drinking in front of him when they were told that he was concerned about his grandparents' consumption. Grandfather denied being inebriated when he had all three grandkids in the car and "brushed" a vehicle in front of Aunt's house.

¶ 10    Grandmother and Grandfather do not have a plan for E.A.'s care if they become unable to care for him. They will rely on the former girlfriend or maybe their daughter and son-in-law. They currently "bring [the former girlfriend] into the picture all the time" and her relationship with E.A. is like that of a mother and child. If their petition is granted, E.A. will be spending as much time with her as he wants. Aunt and Uncle have not demonstrated to Grandfather that they have a relationship with E.A.

¶ 11    Grandmother did not let Sister attend Father's funeral and their relationship with her is nonexistent because she has not contacted them. Grandfather is not trying to foster E.A.'s relationship with his only sibling, because Grandfather does not think that it is his job. Grandfather added that as an 11-year-old, it is not E.A.'s job either. Instead, Grandfather thinks that it is Sister's job, because she is an adult.

¶ 12    Grandfather's only communication with his own daughter in the past year was a letter suggested by a family therapist in which he told Aunt that he loved her and wanted to talk. He did not invite Aunt and Uncle to any of E.A.'s events because Grandmother handled invitations and E.A. coordinated his own visits with his aunt and uncle. It had been quite some time since Grandfather had any relationship with Aunt and Uncle's children. Grandfather does not know the

reason for the change.

¶ 13 E.A.'s assets total about $1.25 million and consist mostly of $500,000 equity in the Avers Avenue house, an investment account and a trust fund created for Father by Father's grandparents. Grandfather was the beneficiary of Father's life insurance and an IRA, but intends to give them to E.A. E.A. also receives $1600 a month in Social Security death benefits. Grandfather cannot currently administer all of E.A.'s assets because he has not "start[ed] the probate process" for Father's estate, and until then, he accesses cash as Father's trustee. E.A.'s assets pay for his health insurance and healthcare, and the Avers Avenue mortgage (about $2,600), taxes, and utilities. Friend has never contributed to any of the expenses because the estate "would have to pay the mortgage on it regardless." Also, while she is there protecting the property, Grandfather does not have to spend any of his time protecting it. Grandmother and Grandfather are financially secure.

¶ 14 Grandmother testified that she is 79, a retired Spanish teacher, and in good health. She and Grandfather went to Albuquerque to meet E.A. as a newborn and made frequent visits after that. (The record suggests that Mother's cancer treatment started during E.A.'s first year.) When the family was socializing every day during the pandemic, the three grandchildren developed close relationships. E.A., however, did not spend any one-on-one time with the adults and did not interact with Aunt and Uncle. Grandmother has not seen Aunt's children since a family birthday party in October of 2024. She asked to see them on Christmas Eve but did not get a response and did not ask again. Aunt e-mailed Grandmother in February and again in June or July, criticizing Grandmother and Grandfather's interaction with her son, C.M.L., and Aunt also "went into some nasty stuff about why she doesn't *** talk to [her parents]." Grandmother "uninvited" E.A.'s sister from Father's funeral and has not contacted her since, even though it is important for E.A. to have

a relationship with his only sibling. E.A. makes his own plans with Aunt and Uncle and then updates Grandmother. There was a group calendar about E.A. that Friend managed, but Grandmother did not look at it. They did group texts, but that got confusing because Uncle did not always include Friend.

¶ 15    Shortly after Father died, the four petitioners tried to mediate custody. They had three sessions between March and September. In the final one, which was just between Grandmother and Aunt, Aunt said that her parents had replaced her with Friend and that Friend should stop acting like E.A.'s mother. Grandmother, however, considered Friend to be like E.A.'s mom. When Friend was living with Father, E.A. "finally had the family he wanted, a mother and a father." Grandmother keeps Friend closely involved and would rather co-parent with her, because she is more cooperative than Aunt. The four petitioners did not have a fourth mediation session together because Aunt and Uncle decided against it and met with the mediator separately. They reached a memo of understanding in April of 2024 that said that Grandmother and Grandfather should become the guardians of E.A.'s estate. (Grandmother did not disclose why they did not follow through on this agreement.) Grandmother and Grandfather drafted two other memos that included parenting time, but Aunt and Uncle rejected them and Grandmother and Grandfather began keeping E.A. all of the time.

¶ 16    Grandmother described E.A. as kind and inquisitive and she said that E.A. inherited his parents' fantastic sense of humor. He does not take criticism well, but he is basically a good kid who does not need to be disciplined. Grandmother does not differentiate between grandparenting and parenting – grandparents do not let kids do whatever they want. They began moderating their drinking in front of him around July of 2024, on the advice of his grief counselor. Father was

drinking right before taking his own life. They have not planned for E.A.'s care in the event of their illness or death. If they are named E.A.'s primary caregivers and die, then he will be saddened just like Grandmother was when her grandparents died and he would not suffer any "stronger effect."

¶ 17     Grandmother's sister, Rae Ann Gillett, testified that she was 73 and living in Naperville, Illinois. She sees Grandmother, Grandfather and E.A. about once a month. She would generally see Aunt and Uncle only at holiday get-togethers, but there had been none since Easter 2024. Each petitioner would make a good guardian, but Rae Ann supported Grandmother's petition because E.A. would find it difficult to change households.

¶ 18     Friend testified that she is 48, has a 27 year old son, and is divorced. She was unemployed for about a year after Father's death. She met him in 2006. They were reacquainted when he moved back from Albuquerque and became a regular at the brewing company where she was working. She moved in with him in August of 2023. Since Father's death, she has paid nothing to live in the Avers Avenue property and does not consider it her responsibility to reimburse E.A.'s estate.

¶ 19     E.A. had a difficult childhood because of his mother's illness and death and then "dealing with his father." Father drank in front of E.A. to the point of intoxication and Friend considered Father to be an alcoholic. She suggested rehab several times and talked with Grandmother and Grandfather about an intervention. Father would improve, then resume drinking.

¶ 20     The day after Father's death, Aunt and Uncle asked to take E.A., but Friend was not prepared to think about losing him. E.A. spends at least two nights a week with her and they usually have dinner with his grandparents every Tuesday. She also goes to every parent-teacher conference at Grandmother's invitation. E.A. is "a really good kid" who does not need a lot of discipline. He

is mature and articulate, "very chill," has a great sense of humor, and is extremely thoughtful. He "thinks outside the box" and is a good artist and incredible writer.

¶ 21    E.A. sometimes objected to the "forced visitations" with Aunt and Uncle that were required by the memo of understanding. It was very difficult for him to rotate amongst the three households. When the mediation broke down, Friend invited Aunt out for coffee. Aunt said that the best place for E.A. was with her and that she was jealous of Friend's role. About a month before the trial, Aunt sent a text and an e-mail asking Friend to stop backing Grandmother and Grandfather and suggesting that a lengthy trial would cause irreparable damage to the family. Aunt's messages seemed a little demanding and condescending.

¶ 22    Friend was the only person who could add E.A.'s events to the group calendar that she set up for the five adults, but she was not "meticulous" and had kind of given up on updating it. E.A. would struggle if Aunt and Uncle were appointed, because he does not have a relationship with them. When he has a problem, he takes it to Friend or his grandparents. When Friend e-mailed E.A.'s grief therapist about things that E.A. said, she included only Grandmother and Grandfather. Her texts with Grandmother about Aunt probably did not help settle the family feud, but Friend was not concerned about helping the family heal. Grandmother and Grandfather would make the better guardians because E.A. loves them, feels safe and comfortable with them, and they have taken really great care of him. They are patient, kind and loving with him. They have been shifting away from their role as indulgent grandparents who do not have to provide rules or hold E.A. accountable.

¶ 23    Sister testified that she lived with E.A. until he was a toddler. She moved to her father's home in Naperville during high school, went away to college, and was then chosen for a fellowship

in Washington, D.C. She did not see E.A. again until after his father died. Grandmother did not allow Sister to attend Father's funeral and neither Grandmother nor Grandfather have communicated with Sister in years. However, Sister texts with Aunt, Uncle and E.A. and they invited her over in the spring of 2024 during one of her visits to Illinois. She also saw E.A. in June of 2025, when Aunt and Uncle hosted several dinners and suggested that the two siblings plan their own outing. They went to a trampoline park and had a fantastic time. Their time together was very important to Sister and seemed meaningful to E.A. When she returns for the holidays, she will feel "absolutely" comfortable reaching out to Aunt and Uncle about seeing E.A. and "uncomfortable" doing that with Grandmother and Grandfather because of the "events around the funeral."

¶ 24    Judith LeBlang is Grandfather's cousin, but Aunt calls her "Aunt Judy." Judy lives in Glenview. She used to celebrate every major holiday and kid's birthday with the family. Grandmother and Grandfather are very angry with Aunt and Uncle about E.A.'s guardianship and it became impossible to have get-togethers. Grandmother and Grandfather consider it a betrayal that Judy supports Aunt and Uncle's petition. They are wonderful grandparents, but parents engage in more youthful and fun activities. E.A. would benefit from living with other kids and going on family excursions.

¶ 25    Robert Zahniser testified that he is married to Grandmother's first cousin, Vivian. They live in Northbrook, but lived in Glencoe for 37 years, not far from Grandmother and Grandfather. Their monthly get-togethers, and regular texts and phone calls stopped with the filing of the guardianship petition. They talked many times about guardianship, including a very long conversation when Grandfather was angered that a relative told him that he and Grandmother

should not be guardians. Grandfather was also very angry at Aunt and spoke very negatively about her more than once. Robert and Vivian are very close to Aunt and Uncle and have given them financial and healthcare powers of attorney. Robert and Uncle also go out for breakfast once a week and Robert thinks of Uncle as a son. Although Robert and Vivian made it clear that they could maintain relationships with both couples, Grandmother and Grandfather did not see it that way. In an e-mail, Grandmother accused Robert of turning all of Grandfather's relatives against him and Grandmother said that Grandfather would not forgive Robert. Robert took Grandmother's e-mail as her suggestion that Robert should not attend the family's annual Memorial Day gathering at a small cemetery in Wisconsin. At the cemetery, Grandmother and Grandfather stayed very far away from Robert and Vivian and would not communicate with them. Grandfather had been unforgiving of other family members in the past, would speak very disparagingly about them, and would make it clear that he did not want them in his home.

¶ 26    Robert observed E.A. numerous times with Aunt and Uncle, such as at sporting events and when they came over to swim in Robert and Vivian's pool. Aunt and Uncle are very loving parents who interact well with all three children. E.A. is very intelligent, witty, kind, and talented. However, he refers to himself as a "special" individual who may decide what to do instead of someone telling him what should be done. Robert has an undergraduate degree in education and psychology, a master's degree in counseling and education, and 60 additional hours in related fields. He also has 34 years' experience teaching grades 3 through 6, and a very active practice in counseling, educational therapy, and tutoring. For much of his career, Robert has been working actively with psychiatrists, psychologists, and social workers to help children in the same difficult circumstances as E.A.'s where multiple people are acting in a parental role. In Robert's opinion,

it had been "very confusing" for E.A. to split his week between the three households, given that each had different expectations and routines. Typically, when multiple people are in a parental role and are in disagreement, each of them wants "special standing" with the child and has difficulty saying "no." "In essence, the child is running the situation[,] as opposed to the parent running the situation." Children benefit from being surrounded by supportive and loving adults who are not parental figures. The circuit court clarified that Robert was testifying as a lay witness, rather than an expert witness.

¶ 27 Uncle testified that he was 47 and that he and Aunt married and bought a home together in Skokie 12 years ago. He has been with the same employer for 25 years and works from home in workforce management. Their son, C.M.L., is 10 and going into the fifth grade. Their daughter, E.L., is 8, and would be a third grader at the same school. Uncle makes their breakfast and ensures that they have whatever they will need for the day before they go to the bus stop. After school, he makes snacks, they do homework, and they unwind with friends in the neighborhood. The family typically has a homecooked dinner together in the kitchen. Then they juggle activities. C.M.L.'s soccer was three nights a week and also some weekends. The family also plays board games, takes walks in the park, and walks their dogs. The kids have time to see friends over the weekend.

¶ 28 E.A. and C.M.L. act like brothers. They trust each other, have a very close bond, and many times E.A. "opened up" to C.M.L. If E.A. came to live with them, the boys would temporarily share the bedroom with bunk beds until they expanded the house. E.A. fits into the family's routine nicely. He plays with his cousins and neighbors whom he met through C.M.L. or at the camp they have been going to since Father was alive. Three of their mutual friends will be starting middle school like E.A. E.A. is a talented, "goofy, artsy kid," who is very affectionate and very empathetic.

He took digital art classes at a studio in Evanston, was in the school band and had been in the talent show. If the three kids had activities at the same time, Uncle hoped that the family would help. Otherwise, he and Aunt have very good relationships with a network of neighbors.

¶ 29    Uncle volunteered to handle their communications with the three other adults and is open to E.A. spending a significant amount of time with them. Uncle has made an effort to build his individual relationship with E.A. by spending time together. Uncle attends the school meetings for E.A.'s "504 plan."[2]

¶ 30    Aunt is 45 and has taught Spanish for 19 years. Her typical day starts early, with exercise and waking up her kids before she leaves for work. After school, the kids snack while Aunt washes dishes. Then there is time to take a walk and get dinner started. They eat out only for special occasions.

¶ 31    E.A. is very playful, imaginative, and sweet. He loves to make others smile and laugh. He likes art, drawing contests, Pokémon and other activities that use his imagination. During the pandemic, he came over almost every day after e-learning and would stay for dinner. At first, Father, Grandmother and Grandfather came too, but as soon as the restaurants reopened, Grandmother and Grandfather started going out to dinner by themselves. Aunt usually picked up all three kids at camp and the kids played together until Father came to get E.A. and sometimes stay for dinner. When Father started dating Friend, E.A. came over on the weekends. Whenever Father asked if E.A. could come over, Aunt's response was that he was always welcome. The kids might also invite E.A. over – they did not have to get her permission. E.A. had his first sleepover

---

[2] There was no testimony defining a "504 plan." However, E.A.'s 504 plan allows him to access the school counselors as needed.

at their house and more sleepovers after Father died. Through mediation, they agreed to co-parent E.A., so he began staying over two and then three nights a week, but Grandmother and Grandfather would not agree to four nights and stopped the sleepovers entirely in the fall of 2024.

¶ 32    Aunt was not invited to any of E.A.'s parent-teacher conferences and was told that the teachers were not allowed to speak with her. E.A. had a flashback in the winter of 2024 about his father, so Aunt sat with him and they talked about how to feel safe and grounded. She initiated his 504 plan because she realized that when he started middle school, the teachers would not know him and accommodate his needs. However, Grandmother and Grandfather said that E.A. did not need the help. Aunt also e-mailed E.A.'s private therapist in June and then the therapist met with her and Uncle because C.M.L. told Aunt that E.A. witnessed his father's suicide, including what happened before and after.

¶ 33    Aunt visits Aunt Judy; Robert and Vivian; and a cousin whose eldest child is E.L.'s age. Aunt stopped attending big family gatherings in May of 2024, when she realized that being around her parents made her anxious. They had no empathy and said horrible things to her and about her. They did not care that her brother tried to kill her in his driveway in 2019. He injured all three of them, yet Grandmother said that Aunt was destroying the family. Five years later, when Aunt spoke with them about what Father did, her mother again said that Aunt was destroying the family by not forgiving him. They faulted Aunt because she handed Father another beer and spoke to him condescendingly. When Aunt and Grandmother tried family therapy and Aunt was "crying and crying," Grandmother treated her with complete indifference and either made excuses or altered history. Aunt made the decision for her own mental health to separate from her parents.

¶ 34    Aunt thinks, however, that it is important for E.A. to have a relationship with them and that

they are good grandparents, but that grandparents and parents have different roles. They are not suitable guardians given their age and how they raised Aunt and Father. Aunt is more suited because she is active, involved with her community, has a support network, and would still be there for E.A. in his adulthood. She would allow him to communicate with them and spend as much time with them as he needs, provided there is no drinking. Aunt also thinks it is important for E.A. to continue a relationship with Friend. Aunt talks with E.A.'s sister at least monthly and coordinates their visits because the siblings' relationship is important and Sister is the closest link that E.A. has to his amazing mother.

¶ 35     Aunt and Uncle intend a gradual transition if their petition is granted and will consult with E.A.'s therapist throughout the process. They can afford his day-to-day expenses and want to ensure that his funds are protected for his future. The two boys get along wonderfully, enjoy roughhousing and video gaming, and seek out the neighbors for games. Aunt anticipates giving E.A. more individual time, such as when they have walked the dog together and spent time chatting in the kitchen while his cousins have preferred to play outside. Even though the boys would share a room, there is an alcove designated just for E.A. with a beanbag chair and some books. They are considering a home expansion so that each child has a bedroom.

¶ 36     The GAL was the final witness. She testified that she had 17 years' experience. She spoke with E.A. twice; the mental health professionals, including four conversations with his individual therapist; the family therapist who had worked with the four petitioners; all four petitioners; Robert; and Friend. The GAL also reviewed the 504 plan, e-mails between the adults and with the individual therapist, and the hundreds upon hundreds of texts in discovery.

¶ 37     The GAL filed a report in December of 2024 stating that it was in E.A.'s best interest that

Aunt and Uncle be named co-guardians. She repeated the recommendation in a supplemental report that she filed when the trial started in July of 2025. However, she added that granting either petition would yield its own set of benefits. She also recommended that the court grant visitation and that the appointed guardians foster E.A.'s relationship with the other petitioners and the father's former girlfriend. The GAL's interviews indicated that E.A. experienced a lot of loss, should not experience more loss, and really needs support from all five adults.

¶ 38    The GAL testified that neither she nor any of the other professionals had any concerns about the four petitioners, as each of them is capable of providing a loving environment. E.A. expressed that he prefers guardianship with his grandparents. He reasoned that he should feel safe at home, that he felt safe with Grandmother and Grandfather, and that he did not have the same sense of trust and safety at Aunt and Uncle's house. However, when the GAL asked him about his safety concerns, E.A. actually had "zero safety concerns, not physical, not emotional." So it was "kind of an 11-year-old [using the language] in a different way." He did not express whether Aunt and Uncle should be his guardians. He enjoys time at their house and thinks of it as a place to have fun and hang out with family rather than a place to live permanently.

¶ 39    Grandmother and Grandfather do not set clear boundaries for E.A. and clear boundaries are especially needed now for his growth and development. One of the developmental tasks of adolescents is to push against boundaries and "to figure out what's safe, what's okay, what's the next thing." When clear boundaries are not in place, the adolescent has difficulty "finding his way." Boundaries also express love and are a foundation for healthy adult relationships. The entirety of the GAL's investigation indicated that E.A. set the boundaries in his grandparents' home and that he bore the pressure of implementing the structure himself. He is very responsible,

but boundaries need to come from the guardian's set of values. When the court decides the cross-petitions, boundary-setting should be "a big issue." Aunt and Uncle have clear ideas about boundaries and expectations and are capable of implementing them.

¶ 40    Aunt's unwillingness to talk, e-mail, or text with her parents makes her communication with them difficult. Her husband has been designated as the primary communicator, which is not a problem, but some increased communication would benefit E.A. Aunt and Uncle have the parenting skills to maintain E.A.'s special relationship with his grandparents and Friend.

¶ 41    Aunt and Uncle are also capable of building a primary caregiver relationship with E.A. The GAL was not concerned about moving him to Aunt and Uncle's care, even though it would be a very difficult transition for him. However, all five adults should be ready to support him. He has healthy relationships with Aunt and Uncle's kids. He confides in his cousin, C.M.L., which indicates trust. E.A. has been able to share some thoughts that he might not be able to share with others.

¶ 42    Another instance of improper boundary setting occurred in Grandmother and Grandfather's communications to E.A. about the court case. The four adults were in disagreement, which was the fault of all four, and they did not give E.A. a unified message. The GAL did not have any concerns about how Aunt and Uncle talked with E.A. about the court proceedings – they did their very best to not talk about the case at all. However, Grandmother and Grandfather "struggled" and "put[] pressure" on E.A. They made the 4-hour visitation order in the fall difficult for E.A. When the visitation hours were increased, E.A. spontaneously told the GAL, "I'm not going there from 9:00 a.m. to 7:00 p.m." She asked E.A. why he said that and he responded "that his grandfather had read [that] off his tablet."

1-25-1674

¶ 43    In addition to improper boundary setting, another consideration was that if E.A. was raised by his grandparents, then he was more likely to experience another difficult loss of a primary caregiver. His school social worker in particular was concerned about that. Younger children are more flexible about change. Transitioning now would be easier than during middle or high school.

¶ 44    At the conclusion of the hearing, the court took the matter under advisement and a week later, issued its decision. The court noted that by all accounts, E.A. is "well-behaved, bright, thoughtful, artistic and articulate." He has experienced a significant amount of trauma throughout his young life and now regularly attends therapy and obtains assistance at school. The four petitioning parties all clearly love and want what is best for E.A. In addition, he has spent a significant amount of time with his father's former girlfriend and has developed a strong bond with her. The GAL opined that all five adults are critically important to E.A. and should remain in his life. The GAL had also opined that either pair of petitioners would make excellent co-guardians. Nevertheless, the GAL testified credibly about the lack of various boundaries that E.A. experiences in his grandparents' care. While they "clearly want to show [him] nothing but love and support," the "line between grandparenting and childrearing is blurred" in E.A.'s current placement and the "desire to prevent any disappointment in [his] life results in additional stress on [E.A.]." Thus, remaining in Grandmother and Grandfather's care would not be ideal for E.A.

¶ 45    The court also considered how to foster the involvement of all five adults, despite the "complicated and strained" relationship between the two sets of petitioners. "The relationship appears to have been strained for a long period of time and has only grown worse since the death of [E.A.'s] father and the commencement of these proceedings." Although the court did not go into detail, there was ample testimony that the four petitioners and three children no longer gather

- 18 -

for nightly or weekly dinners or have events with the extended family such as children's birthday parties, holiday meals, and the Memorial Day gatherings in Wisconsin. At least three of the witnesses seemed to attribute the breakdown to Grandmother and Grandfather

¶ 46    The court concluded that, given the nature of the four adults' relationship and the "residual impact on [the] family and community[,] it is difficult to see how [Grandmother, Grandfather and Aunt], at this time, could fulfill their duty of fostering relationship[s] between [E.A. and the other members of his close and extended family]. This left Uncle – "the one member of the group who can communicate with everyone" – as the only real choice. The court said that while it was reluctant to introduce more changes into E.A.'s life, "any short-term adjustments are outweighed by a longer-term benefit" to E.A. The court found "that it is in the best interests of the minor that [Uncle] be appointed Guardian of the Estate and Person of [E.A.]."

¶ 47    Grandmother and Grandfather did not request a stay of the ruling that was entered nearly a year ago on July 29, 2025.

¶ 48    The parties disagree as to what factors should have been included in the circuit court's consideration. The section of the Probate Act concerning the "[a]ppointment of [a] guardian" contains a "best interest" standard (755 ILCS 5/11-5 (West 2024)), but that standard is not defined. Section 11-5 of the Probate Act provides: "Upon the filing of a petition for the appointment of a guardian or on its own motion, the court may appoint a guardian of the estate or of both the person and estate, of a minor, or may appoint a guardian of the person only of a minor or minors, as the court finds to be in the best interest of the minor or minors." 755 ILCS 5/11-5(a) (West 2024).

¶ 49    Grandmother and Grandfather contend that *In re Estate of Suggs*, 149 Ill. App. 3d 793 (1986), shows that the Uncle's appointment was not in E.A.'s best interest.

¶ 50    In *Suggs*, the appellate court said that the six factors listed in section 602(a) of the Marriage and Dissolution of Marriage Act, 750 ILCS 5/602(a) (West 2008), are not mandatory in guardianship proceedings, but "are important considerations in ensuring that the guardianship of a minor corresponds to his or her best interest." *Suggs*, 149 Ill. App. 3d at 799. That act provided:

> " 'Sec. 602. Best interest of child. (a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:
>
> (1) the wishes of the child's parent or parents as to his custody;
>
> (2) the wishes of the child as to his custodian;
>
> (3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;
>
> (4) the child's adjustment to his home, school and community;
>
> (5) the mental and physical health of all individuals involved; and
>
> (6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child.' Ill. Rev. Stat.1983, ch. 40, par. 602(a)." *Id.*[3]

¶ 51    Even though the *Suggs* factors are not mandatory, Illinois courts have used them as a guide. *In re Guardianship of A.G.G.*, 406 Ill. App. 3d 389, 393 (2011) (citing *In re Marriage of Russell*, 169 Ill. App. 3d 97, 102 (1988) (following *Suggs*)).

¶ 52    The statutory factors are not mandatory in this context because the probate court is

---

[3] This portion of the Marriage and Dissolution of Marriage Act has since been substantially revised. See P.A. 99-90, § 5-15 (eff. Jan. 1, 2016). The revision anticipates that "parenting time" and significant "decision-making responsibilities" can be shared or allocated separately pursuant to more than a dozen different considerations. *See* 750 ILCS 5/602.5, 5/602.7 (West 2026).

operating pursuant to its inherent plenary power, independent of any authority that the Probate Act or other legislative enactment has conferred. *Suggs*, 149 Ill. App. 3d at 797.

¶ 53    The fact that the circuit courts have inherent plenary power to appoint guardians of the estates and persons of minors – independent of any statute – was dispositive of the appeal in *In re Guardianship of Smythe*, 65 Ill. App. 2d 431 (1965). The Smythes were Kentucky residents who were involved in a car accident in Illinois that was fatal to the parents and left their two young children in a hospital in downstate Illinois. *Id.* at 435. Some of the children's relatives were in Illinois. Four days after the collision, one of the Illinois relatives petitioned and was named plenary guardian. *Id.* at 433. Other relatives, however, lived in Indiana. The Indiana relatives took the children out of the hospital, transported them to Indiana, and filed a motion to vacate the appointment. *Id.* at 434-35. They argued that the court lacked jurisdiction, in part because the Probate Act specified that the minors had to be residents of Illinois, and that the children had no estates in Illinois. *Id.* at 436. The appellate court affirmed the appointment, however, because the trial judge had inherent plenary jurisdiction to appoint guardians of the persons and estates of minors, independent of any authority given to the courts by the legislature. *Id.* at 441-43. There was no reason to parse through the text and meaning of the statute. The power of the circuit court existed independently of the statute, and the interpretation of the statute was "a mere abstract question not necessary for the determination of the [appeal]." *Id.* at 439. "[C]ourts of equity from time immemorial have upon proper application, assumed jurisdiction over the persons and property of infants." *Id.* at 442. "[S]ince the English courts of chancery had jurisdiction over the persons and estates of infants, *** the circuit courts of this state were granted [the same jurisdiction] by the adoption of [Illinois' original] constitution." *Id.* at 443. The circuit court was empowered to

act in the Smythe children's welfare and award custody to their Illinois relative, even though the children may not been domiciled in or legal residents of Illinois. *Id.* at 444. "The Smythe children were orphans in need of the protection of the courts of this state." *Id.*

¶ 54    The fact that the circuit court has an independent source of authority in the common law was also discussed in detail in *Green*, where the court surveyed supreme court precedent dating to 1846. *In re Estate of Green*, 359 Ill. App. 3d 730, 736-37 (2005). Even that early case described the court's power in such matters as being "of very ancient origin." *Cowls v. Cowls*, 8 Ill. 435, 437 (1846). The " 'legislature conferred no new authority or jurisdiction upon the court; "[i]t was by its original jurisdiction clothed with the same powers before." ' " *Green*, 359 Ill. App. 3d at 736 (quoting *M.M.*, 156 Ill. 2d at 68 (quoting *Cowls*, 8 Ill. at 438)).

¶ 55    In *Green*, the trial judge denied a guardianship petition under the mistaken belief that the Probate Act constrained his authority to appoint a guardian. *Id.* at 730. The child in that case had been living with his half sister and her father, Kenneth, for about two years. *Id.* at 731-32. Kenneth's petition was endorsed by the GAL, who noted that Kenneth had a felony conviction for possessing a handgun, which the GAL described as "insignificant and ten years old." *Id.* at 733. The circuit court agreed with the GAL's recommendation. *Id.* Nevertheless, at a later hearing, the court denied Kenneth's petition because felons were disqualified by the section of the Probate Act concerning "[w]ho may act as guardian." *Id.* at 735 (quoting 755 ILCS 5/11-3 (West 2004)).

¶ 56    The appellate court reversed and granted Kenneth's petition because the ruling was contrary to the manifest weight of the evidence. *Id.* at 739. Strict application of the Probate Act's requirements had "forc[ed] the court to ignore its own conclusion and subordinate the minor's best interest to generic criteria." *Id.* at 738. The legislature's generic criteria did not trump the court's

power under the common law and did not diminish the court's obligation to provide for the child's best interest and welfare. *Id.* In other words, the circuit court's power to appoint the guardian of a minor in *Green* "exist[ed] independently of any statute, including the Probate Act." *Id.* at 737. "[W]here, as here, there exists a counterpart, in common law or equity, to a legislative enactment of a comprehensive statutory scheme, the court is not bound to proceed within the strictures of the statute." *Id.* (citing *M.M.*, 156 Ill. 2d at 65-66.) " ' "Courts of equity have plenary jurisdiction over the persons and estates of infants, and will in the exercise of that jurisdiction, cause to be done whatever may be necessary to preserve their estates and protect their interest." ' " *Id*. (quoting *Smythe*, 65 Ill. App. 2d at 440-41 (quoting *Ames v. Ames*, 151 Ill. 280, 285 (1894))). See also *Suggs*, 149 Ill. App. 3d at 799 (circuit court is not required to consider any particular criteria when determining a minor's placement with a guardian).

¶ 57    In contrast, adoptions and juvenile court proceedings did not exist at common law and are examples of matters that were created and defined solely by the legislature. *M.M.*, 156 Ill. 2d at 63, 66.

> "Where the legislature enacts a comprehensive statutory scheme, creating rights and duties which have no counterpart in common law or equity, the legislature has created a 'justiciable matter.' [Citation.] ***
>
> The legislature may define the 'justiciable matter' in such a way as to preclude or limit the authority of the circuit court. [Citations.] When a court's power to act is controlled by statute, the court is governed by the rules of limited jurisdiction [citations] and courts exercising jurisdiction over such matters must proceed within the strictures of the statute [citation]." *Id.* at 65-66.

¶ 58    In this case, the circuit court acted pursuant to its inherent plenary power when it evaluated whether granting one of the two petitions was in E.A.'s best interest. *Green*, 359 Ill. App. 3d at 730 (citing *M.M,*, 156 Ill. 2d at 63). Its " 'sole responsibility [was to safeguard his] best interest and welfare.' " *Id.* at 738 (quoting *In re Estates of Herrod*, 254 Ill. App. 3d 1061, 1065 (1993)). Furthermore, our review concerns the circuit court's judgment rather than its stated reasons, and we may sustain the judgment on any ground warranted, regardless of whether it was relied on by the circuit court. *In re V.S.*, 2023 IL App (1st) 220817, ¶ 64; *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 59    Accordingly, we are not persuaded by Grandmother and Grandfather's contention that the circuit court imposed an inappropriate standard or gave too much consideration to certain facts when it contemplated the strained relationships, communication breakdown, and lack of clear behavioral boundaries that were identified by the GAL.

¶ 60    Grandmother and Grandfather also contend that certain factors that are set out in the definitions section of the Juvenile Court Act of 1987 are "instructive" in this context. 705 ILCS 405/1-1 (West 2024). The "best interest" standard appears in various sections of the Juvenile Court Act, appearing, for instance, in the section that permits a court to remove a minor child from their parents, guardian, or legal custodian and find a different placement. 705 ILCS 405/5-740 (West 2024). Another example is the section regarding the appointment of a guardian *ad litem* for an abused or neglected minor. 705 ILCS 40/2-17 (West 2024). The definitions section states that "[w]henever a 'best interest' determination is required," ten factors shall be considered, beginning with "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing." Pub. Act. 103-1061 (eff. Feb. 25, 2025) (amending 705 ILCS 405/1-3(4.05) (West 2024)).

¶ 61 Grandmother and Grandfather contend that the circuit court "dismissed" at least three of the Juvenile Court Act's factors. However, they did not cite this standard in the circuit court and fail to cite any precedent now in which a court applied the Juvenile Court Act. We could disregard their argument entirely because it is not supported by citation to authority as required by the appellate briefing rules. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re Marriage of Lugo*, 2025 IL App (1st) 231478, ¶ 102 (finding forfeiture due to undeveloped arguments and lack of citation to authority). Even so, we point out that the factors were utilized in *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶ 22 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006) and citing 705 ILCS 405/1-3(4.05) (West 2016)). In *H.J.*, after terminating parental rights, the circuit court heard the grandparents' petition for custody and the foster parent's cross-petition for custody or guardianship. *H.J.*, 2021 IL App (4th) 200401. Those circumstances are distinguishable because the children had been adjudicated as neglected and temporary custody and guardianship was placed with the Department of Children and Family Services. *Id.* ¶ 4. Proceedings regarding neglected children are subject to a statutory scheme that has no particular relevance here. We decline to import any part of the Juvenile Court Act's "best interest" definition into these proceedings.

¶ 62 Aunt and Uncle propose that we apply the factors set out in section 11-14.1(b) of the Probate Act, which is the "revocation of letters" section. 755 ILCS 5/11-14.1(b) (West 2024). That section governs the termination of a guardianship when there is a material change in circumstances, *unless* the guardian establishes that "termination *** would not be in the best interests of the minor." (Emphasis added.) *Id.* Those five factors include details about the minor's parents, such as "(1) The interaction and interrelationship of the minor with the parent and members of the

parent's household" and "(2) The ability of the parent to provide a safe, nurturing environment for the minor." *Id.* Aunt and Uncle cite *A.G.G.*, 406 Ill. App. 3d at 393-94, as an example of when the factors were utilized. They do not cite any authority applying these factors in a proceeding similar to this one. In our opinion, terminating a guardianship so that the child may return to the parent is quite different from the present circumstances.

¶ 63    Accordingly, we will review the factors that were endorsed in *Suggs*, 149 Ill. App. 3d at 799, but emphasize that the probate court was under no obligation to consider any of these factors and operated with broad discretion in this minor guardianship proceeding. "This discretion is not unlimited and will be overturned if the reviewing court finds that the [court] abused its discretion" (*Green*, 359 Ill. App. 3d at 735), or if its decision is against the manifest weight of the evidence. *H.J.*, 2021 IL App (4th) 200401, ¶ 23. An abuse of discretion has occurred when the ruling is arbitrary or unsupported by the evidence, or where no reasonable person would take the same view. *In re Estate of M.L*, 2018 IL App (3d) 170712, ¶ 23. A decision is against the manifest weight only when the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence. *H.J.*, 2021 IL App (4th) 200401, ¶ 23; *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181-82 (2002). A guardian's appointment must be made "in light of all the relevant facts." *Green*, 359 Ill. App. 3d at 735.

¶ 64    The first factor from *Suggs* is the wishes of the child's parent or parents as to his custody. *Suggs*, 149 Ill. App. 3d at 799. There was no evidence that Mother or Father expressed a preference as to who would care for their child if necessary. There is absolutely no record support for Grandmother and Grandfather's contention that it "can be presumed" that Father would not want his son to be part of Aunt's household because she "despised" her brother.

¶ 65    As for E.A.'s preference, it is undisputed that he wanted to live with his grandparents. Grandmother and Grandfather argue that E.A. told the GAL that he had great trust in his grandparents and that he did not trust or feel safe with Aunt and Uncle The GAL testified, however, that when she talked with E.A. about his sense of safety in the two households, he actually had no physical or emotional safety concerns whatsoever about his aunt and uncle's home and seemed to be using the terminology in an unconventional way. The entirety of the GAL's investigation indicated that not one of the many professionals involved in E.A.'s life had any concerns about any of the four petitioners' abilities to provide a loving environment.

¶ 66    Grandmother and Grandfather argue that the court was preoccupied with the lack of communication between the adults and ignored the fact that Grandmother, Grandfather and Friend are the "three most important people" in E.A.'s life, in contrast to Aunt and Uncle who have never developed or tried to develop a relationship with E.A. They contend that (a) Friend "was a mother" to E.A.; (b) Grandmother and Grandfather have been in his life consistently since he was 10 days old; (c) Father and E.A. lived with Grandmother and Grandfather during COVID-19 and their house hunt; and (d) Grandmother and Grandfather have acted as E.A.'s parents since Father died.

¶ 67    We do not find this argument persuasive, because there was conflicting testimony about the extent of Aunt and Uncle's relationship with E.A. While Grandmother, Grandfather and Friend suggested that Aunt and Uncle did not interact with E.A., the record indicates that Aunt and Uncle were directly involved in E.A.'s life, such as after e-learning sessions during the pandemic and on weekends. In addition, Father entrusted them with E.A.'s care, including when E.A. needed after-camp care and was ready for his first sleepover. When Father died, Aunt and Uncle immediately expressed interest in becoming E.A.'s guardians. As for whether Aunt and Uncle spent as much

time with E.A. and developed a deeper bond with him, the record indicates that they were working parents while Friend was unemployed for about a year and Grandmother and Grandfather seem to have been fully retired. Furthermore, Aunt and Uncle's time with E.A. was impeded when the relationship of the five adults became strained in the wake of Father's death and the filing of the cross-petitions. The GAL testified that what Grandmother and Grandfather said to E.A. about visiting Aunt and Uncle burdened the child and made even the initial four-hour visits difficult for him. The GAL's testimony suggested that Grandfather also coached E.A. to resist longer visits. Nevertheless, Aunt and Uncle pursued increasing co-parenting time at a pace that was considerate of E.A.'s circumstances and they persisted with their guardianship petition despite Grandmother and Grandfather's anger and opposition. The credibility and weight of the testimony was addressed by the circuit court. The circuit court is in a much better petition to observe witnesses, assess their credibility, and weigh the evidence, than an appellate court could ever be when reading the cold record. *H.J.*, 2021 IL App (4th) 200401, ¶ 23; *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002) (because the fact finder is in the best position to observe the conduct and demeanor of the parties and the witnesses, it has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain). Moreover, the court's overriding concern was that E.A. have the support of all five adults, his sister, and his extended family members. It would have been "difficult" for this to occur had E.A. remained in Grandmother and Grandfather's care.

¶ 68     The third factor concerns E.A's "interaction and interrelationship [with] *** his siblings and any other person who may significantly affect the child's best interest." E.A. had limited interaction with his only sibling, Sister, due to Grandmother and Grandfather; Grandmother would not allow Sister to attend Father's funeral and neither Grandmother nor Grandfather tried to

facilitate any communication or interaction between E.A. and Sister during the 19 months that he was in their care. Grandmother testified that she was not obligated to contact Sister and Grandfather testified that he had no obligation to foster the siblings' relationship. Aunt and Uncle, however, reached out to Sister, hosted her for family dinners, and suggested the siblings' memorable outing to the trampoline park. Sister testified that she felt "encouraged" by Aunt and Uncle and would "absolutely" feel comfortable arranging future visits through them and "less comfortable" or even "uncomfortable" doing so with Grandmother and Grandfather.

¶ 69     E.A. had positive relationships with all of his close and extended family members, and with his father's former girlfriend, who continued to live nearby and was emotionally supportive. However, Grandmother and Grandfather curtailed or prevented E.A. from spending time with relatives who did not support their petition.

¶ 70     Grandmother and Grandfather contend that E.A. should not be living with Aunt because she "threatened" Friend that she would not be able to have a relationship with E.A. if Aunt were his guardian. Friend's testimony was equivocal and Aunt testified that E.A. should continue to have a relationship with Friend.

¶ 71     Grandmother and Grandfather contend that the court used an inappropriate standard by focusing on the relationship between the four parties and not the relationship of the minor with his four family members. They cite the statement in *Suggs*, 149 Ill. App. 3d at 798, that the court "must protect the minor child first; the feelings and desires of the adult parties are inferior in this regard." Grandmother and Grandfather misconstrue the circuit court's ruling. The court did not address what was "beneficial for the adults." The court discussed the adults' interactions because their estrangement hindered their abilities to meet E.A.'s needs. Because E.A. has experienced deeply

impactful losses, "all the adults in his life are critically important to [him]" and should remain accessible to him. They could meet his needs by coordinating and communicating amongst themselves. However, they have been coordinating "haphazardly" through a shared, inaccurate calendar and sporadic texting. The circuit court also said that the relationship between the grandparents and aunt is "strained to non-existent" and rendered those three unable to "fulfill their duty of fostering [E.A.'s] relationship[s]" with "the other members of this immediate and extended family." The court did not try to mend the adults' ruptured relationships. Rather, the court tried to work around that reality by appointing Uncle, who is "the one member of this group that can communicate with everyone." By doing so, the court was providing for E.A.'s best interests and welfare, which was the proper standard. The circuit court's primary reason for choosing Uncle was to cultivate the relationships that diminished after Father died.

¶ 72    *Suggs*' third factor also encompasses Grandmother and Grandfather's "interaction and interrelationships" with E.A. *Suggs*, 149 Ill. App. 3d at 799. The GAL gave considerable testimony about the lack of clear boundaries E.A. was given while in his grandparents' care and that this was "*the* big thing" for the court to contemplate. (Emphasis added.) Grandmother and Grandfather contend that the GAL's testimony about "blurred" boundaries was mostly about E.A.'s opposition to the court-ordered visitation with his aunt and uncle. They argue that the GAL and court seemed to be disappointed that E.A. knew about the court orders, yet the only way the grandparents could get him to comply with the orders was by telling him about the orders.

¶ 73    This argument is misdirected. The order does not refer to the visitation orders. The GAL testified about multiple boundaries and indicated that Grandmother and Grandfather generally were not setting *any* clear boundaries on the 11 year old's behavior and that he had to create

structure himself, which distressed him. Even Grandfather testified that E.A. was "very regimented" and made up his own behavioral rules and that Grandfather gave in to E.A. because Grandfather thought that he was putting E.A.'s needs first. Friend also acknowledged that Grandmother and Grandfather's parenting was inadequate. She testified that grandparents indulge their grandkids and do not "have to hold the kids accountable or give them rules *per se*," but that Grandmother and Grandfather's authority had been "evolv[ing] over the last 18 months" as they "shift[] into more of a parenting guidance role." Robert gave similar testimony from his perspective as a close family member and lay person who spent many years educating and counseling children in difficult circumstances. Robert suggested that when there were five people in parental roles, the child would wind up "running the situation." The GAL not only interviewed the five primary adults in E.A.'s life, but also spoke with Robert, E.A., various school personnel, E.A.'s therapist, and a family therapist; and she read many e-mails and texts before testifying that the entirety of her investigation led to her concern about E.A.'s placement with his grandparents. The GAL's concern was not limited to Grandmother and Grandfather's inappropriate communication with E.A. about the specific topic of court-ordered visitation. Rather, the way that the "well-intentioned wonderful grandparents" relate with E.A. when they are in a parental role was stressful for the child. The GAL said that E.A. was living in a "confusing environment" and needed to be given clear boundaries, particularly as he develops into adolescence, tests the limitations, and "find[s] his way" in life. The foundation that is created for E.A. as a child and adolescent will shape his relationships into adulthood. The GAL emphasized that the lack of boundary setting should be paramount in the court's consideration. The court later specified that "several witnesses, including the GAL, testified credibly to the lack of boundaries in the current

placement." Thus, the record belies Grandmother and Grandfather's attempt to downplay the court's concern about blurred boundaries. The court's concern extended beyond Grandmother and Grandfather's inappropriate communication with E.A. about the legal proceedings. The court's concern included Grandmother and Grandfather's lack of guidance and caretaking. Grandmother and Grandfather are doting grandparents but not parental figures.

¶ 74    As for the fourth factor, E.A. was adjusted to his home, school and community, because he was still attending the same school and residing in close proximity to Father's residence on Avers Avenue. Grandmother and Grandfather emphasize that the ruling caused E.A. to move, start new friendships, and change schools. The transition is not as stark as Grandmother and Grandfather suggest. They contend that E.A. lost his own space at home, but a quiet nook with a beanbag chair was already set aside for E.A. in Aunt and Uncle's home. Furthermore, E.A. was already familiar with his aunt and uncle's environment. Aunt and Uncle testified to E.A.'s frequent visits to their home while Father was alive, that he played with C.M.L. and the neighborhood kids after e-learning, and that he knew some of the children from the summer camp that he attended with C.M.L. and E.L. for four years. Before his death, Father would ask if E.A. could come over and Aunt's response was that E.A. was always welcome. In addition, E.A. would have to move to a new school campus in the fall, regardless of which guardianship petition was granted, because he was starting middle school.

¶ 75    The fifth factor is the mental and physical health of all individuals involved. No one had health concerns that would affect their ability to care for E.A. Despite their good health, however, Grandmother and Grandfather are nearly 70 years older than E.A. According to the GAL, grandparents will experience the infirmities of aging and are statistically likely to pass away before

an aunt and uncle. Grandmother was asked how E.A. would be affected if she and Grandfather were named guardians and were to pass away as his third and fourth primary caregivers. Grandmother dismissed the impact this could have on E.A., when she testified that her demise while E.A.'s guardian and grandparent would have no more significance to him than she experienced when her grandparents died. The GAL testified that it could be "devastating" for E.A. to lose another set of primary caregivers and that E.A.'s school social worker in particular was concerned about this possibility. E.A. would have less oversight as he navigates into adulthood, experience the emotional pain of losing yet another set of primary caregivers, and have to transition to new caregivers when he is an older child.

¶ 76    The sixth factor is not relevant here because there was no indication of physical violence or threat of physical violence by the child's potential custodians.

¶ 77    Based upon the evidence presented and the witness testimony, the circuit court's decision was not against the manifest weight of the evidence and is affirmed.

¶ 78    Affirmed.